STATE *vs.* NICOLA COLANGELO.

MAY 29, 1935.

PRESENT: Flynn, C. J., Moss, Capotosto, Baker, and Condon, JJ.

CAPOTOSTO, J. This is a criminal complaint brought against the defendant charging him with being a common cheat. A verdict of guilty was returned by the jury in the

superior court. No motion for a new trial was filed. The defendant comes to this court on his bill of exceptions to certain rulings on the admission of evidence by the trial justice. His only claim in both his written brief and his argument is to the effect that such rulings, which included the admission of evidence of immoral practices and conduct, improperly influenced the jury and deprived him of a fair trial on the offense charged.

The defendant, in 1927, was living in a small tenement on the third floor of a house on Meader street in the city of Providence. Up to that time he had been employed as a musician and music teacher. His conversion from a prosaic existence to a person endowed with supernatural power was described by him as originating in a vision which he had on February 12, 1927, while waiting for a pupil who apparently was not going to keep his appointment. The part of the vision, which seems to have made a lasting impression on the defendant, was that as he sat "meditating" he heard a voice say to him: "Though I am the Nazarene, the Christ, thou shalt lead the world, and see life, life, love. As there is only one God, there shall be only one religion, one republic, one nation, and no money to be used except one that says in American money: 'In God We Trust'." From the day of the vision in which he testified this creed was enunciated, the defendant began to treat the sick, the lame and the disordered.

It was not long before the "faithful" made it possible for the defendant to move from his modest home on Meader street to a conspicuously painted mansion at the corner of Almy street and Broadway in this city. Here he held himself out as "Nazarene Christ" and called his new habitation the "House of God." Its maintenance was no burden to him, for many persons, principally women, disregarded the interests of their own families in order to give him either gratuitous service or to supply him with funds to meet his living expenses and financial obligations. An automobile and a chauffeur were soon added for his con-

venience. There was abundant evidence to justify the jury in finding that this conduct of these persons was induced by the artifice and guile of the defendant. What he claimed as "cures" resulted without the administration of any medicine or the use of any means that might come under the head of medical treatment. His treatment, according to him, was purely spiritual and any personal contact with the patient was limited to the touching or feeling of parts of the body of the affected person. He insisted on the title of "professor" because that denoted power, and testified that he made no charge for his treatments, but did receive money by way of "donations" which were voluntarily left by his patients "on the table" in his office. The donations were usually placed in. envelopes which were passed out by an attendant before the prospects saw the professor, with the suggestion that "the more you put in the envelope the better it is for you."

The defendant admitted receiving money in other ways at his "House of God." He regimented his faithful under the name of Religious Alliance or Crusaders. To each member, upon the payment of a dollar, he gave an inexpensive button stamped with a design and letters conveying the suggestion of divine attributes. He also purchased at wholesale gilded keys with small thermometers attached which, according to him, he sold for one dollar each as souvenirs of Providence to his followers, but which, according to others, who later lost faith in his claim of divine power, he enhanced in price to five dollars apiece if he imparted his blessing. He also passed out his photographs with liberality and received remuneration therefor either by a direct payment or through an increased donation.

When the defendant's conduct is considered in the light of the entire record, which we have carefully examined in view of the arguments of his counsel before us, we cannot escape the conclusion that there was plenty of evidence to justify the jury in finding that he was a schemer of the most degraded type, who, clothing himself with the mantle of

religious form, perpetrated upon a gullible and deluded element of the general public an intentional fraud, conceived with the express purpose of getting both services and money through the medium of deceit. The evidence showed that his entire scheme was adapted to result, and in fact resulted, in substantial harm, financially and morally, to those who, through superstition or ignorance, became a prey to his wiles.

The offense of being a common cheat is not specifically defined in our statutes, although a punishment is provided therefor. It remains an offense at common law as modified by the Statute of 33 Henry VIII, ch. 1, (1541), and of 30 George II, ch. 24, (1757), which became the common law of this state at the time of the Revolution. These statutes did away with the requirement that cheating, in order to be punishable as an offense, must be accomplished through the use of a false token or symbol. In this state a person is now guilty of being a common cheat when there "is the fraudulent obtaining of the property of another by any deceitful or irregular practice not amounting to a felony which is of such a nature that it directly affects or may directly affect the public at large." *State* v. *McMahon*, 49 R. I. 107. This doctrine of the common law protects the weak and credulous against the wiles and stratagems of the cunning. An artfully contrived story, or the use of any device, artifice or false representation addressed to the public generally with a fraudulent intent and purpose to deceive those or any one who may rely thereon, which does not amount to a felony, is sufficient to support the charge of being a common cheat.

It is claimed by the defendant that the court erred in permitting the state to introduce evidence of immoral sexual conduct by the defendant. While it is the rule that in the trial of a criminal offense evidence of other and distinct criminal acts is generally prejudicial and inadmissible, yet it is generally conceded that evidence of other acts, representations and conduct at different times, even of a criminal

nature, may be received when they are interwoven with the offense for which the defendant is being tried, or directly support a finding of guilty knowledge in the perpetration of that offense. Any circumstance that is incidental to or connected with the offense under investigation in such a way that it tends to establish guilty knowledge, intent, motive, design, plan, scheme, system, or the like, is proper evidence according to the overwhelming weight of authority.

This well established principle, to be invoked with caution, depends upon the facts in each individual case for its proper application. It has been applied in all types of crimes, from the highest felonies to ordinary misdemeanors, provided such testimony goes to establish a material fact in the chain of proof of the crime in issue. A frequent application of the rule is found in cases of fraud and deceit. The following citations are merely a few from a multitude: *State* v. *Horton, Dougherty,* 47 R. I. 341; *People* v. *Bertsche,* 265 Ill. 272; *Tucker* v. *United States,* 224 Fed. 833; *Farmer* v. *The State,* 100 Ga. 41. The fact that this testimony tends to prove the defendant guilty of another and different offense or to degrade him does not render this evidence inadmissible when it is connected with and forms a link, directly or indirectly, in a scheme to deceive and defraud.

In the present case there was ample evidence that many persons had been led to give money and services to the defendant by representations made by him to the effect that he was an inspired religious healer, a "Nazarene Christ." Any evidence which showed that, during the very period when he was making these representations and in the very house in which he was practicing what he claimed to be divine healing, he was also engaged in immoral sexual conduct toward females who were under his protection and care, was admissible as strongly tending to prove that, when he made these representations, he knew them to be false and that he was acting in bad faith. It should also be noted that no exception was taken at the trial to much

of the evidence of this character, nor was the trial justice asked to instruct the jury to disregard it.

We find no merit in any of the defendant's exceptions or any reason for setting aside the jury's verdict, which was fully supported by the evidence.

The defendant's exceptions are overruled, and the case is remitted to the superior court for further proceedings.

*John P. Hartigan, Attorney General, Michael De Ciantis, Third Asst. Attorney General,* for State.

*Benjamin Cianciarulo, Angelo Cianciarulo, Edward A. Capomacchio,* for defendant.