STATE

v.

Anthony SOUZA.

No. 77–270–C.A.

Supreme Court of Rhode Island.

Feb. 10, 1981.

Dennis J. Roberts II, Atty. Gen., Alyssa L. Talanker, Sp. Asst. Atty. Gen., for plaintiff.

William F. Reilly, Public Defender, John A. MacFadyen III, Barbara Hurst, Paula Rosin, Asst. Public Defenders, for defendant.

## OPINION

WEISBERGER, Justice.

The defendant, Anthony Souza, after jury trial, was found guilty on one count of assault with a dangerous weapon, five counts of robbery, one count of assault with intent to rob, one count of assault with intent to murder a police officer, and one count of possession of a stolen auto. On the robbery counts, the defendant was sentenced to a term of imprisonment for life on each count. On the count charging assault with a dangerous weapon, he was sentenced to a term of ten years' imprisonment. On the count charging assault with intent to murder a police officer, he was sentenced to a twenty-year term of imprisonment. On the count charging possession of a stolen motor vehicle, he received a sentence of five years' imprisonment. On the count charging assault with intent to rob, he was sentenced to a term of twenty years' imprisonment. All sentences were ordered by the trial justice to run concurrently. The defendant has appealed from the judgments of conviction. We affirm.

The multiple charges arose out of a robbery that occurred April 9, 1976, at the Woodlawn Liquor Store in Pawtucket. Two men wearing ski masks confronted eight persons who were in the store, threatened, and in some cases struck, the victims with pistols, and relieved them of various valuable personal effects, including the contents of a cash register. The victims were herded to a cooler in the rear portion of the store. During this activity, three additional customers came to the door and were ordered inside at gunpoint and told to empty their pockets.

While the robbers were still present, two police officers, John Orzechowski and George Kelley, arrived at the scene. While Officer Kelley examined a suspicious-looking automobile parked outside the store, Officer Orzechowski entered the store with his gun drawn. The first robber stripped off his mask and dropped what appeared to be a gun. The second robber fired a shot that hit the officer and propelled him outside onto the sidewalk. The robber continued to fire as the wounded officer crawled under a parked car. The first robber was apprehended by Officer Kelley as the robber attempted to hide behind an automobile. This man was identified as David Cochrane and was later indicted and tried together with defendant Souza. The second robber fled the scene, pulling off his ski mask as he went, and ran down an embankment to nearby railroad tracks. A third policeman, Officer Cates, who arrived just as the robbers left the store, pursued the second robber along the tracks, firing at the fleeing figure as he ran. The robber left the tracks and climbed an embankment. As he did so, Officer Cates fired a final

shot, and the robber appeared to stagger. Thereafter Officer Cates lost sight of the unidentified robber and headed back toward the scene of the crime. Shortly afterward, he and other officers followed a trail of blood which ended, after approximately three-quarters of a mile, at a three-family dwelling house, a portion of which was occupied by an aunt of defendant Anthony Souza.

The principal evidence against Souza was given by Robert Louis DePaulo, who testified that on the night of April 9, 1976, Cochrane and Souza came to the apartment of DePaulo's girlfriend in Central Falls and asked to borrow a dent puller, a mask and a coat hanger. Both men were carrying pistols on this occasion. DePaulo provided the coat hanger and gave Souza a jacket, whereupon Souza and Cochrane left in two separate automobiles. DePaulo testified that at about 11 or 11:30 p. m. that same night Souza returned to the apartment bleeding from his left arm. Souza then told DePaulo the story of his involvement in a holdup and subsequent flight. DePaulo dressed his wound, provided a change of clothes for Souza, and attempted to dispose of the soiled clothes as well as a pistol that Souza had given to him. Subsequent to the visit, after learning that a police officer had been shot, DePaulo called the fire department to put out a fire which he had started in a dumpster in order to dispose of Souza's clothes, and later called the Pawtucket police to tell them of his part in assisting Souza and Cochrane. He ultimately became the chief witness for the state and denied any participation in the holdup. DePaulo's testimony was corroborated by that of his girlfriend, Phyllis Lewis. The defendant raises four major issues on appeal. These issues will be considered seriatim, and such additional facts will be supplied as are relevant to each issue.

I

## DISCLOSURE OF UNIDENTIFIED INFORMANT

In support of an application for a wiretap warrant in respect to a public telephone, Lieutenant Collins of the Pawtucket police department had asserted in an affidavit directed to the Presiding Justice of the Superior Court that he believed Robert DePaulo to have been a principal in the liquor store robbery. The basis for this belief was set forth in the affidavit as a tip from an unidentified but reliable informant who had stated that DePaulo "was a principal in the holdup that took place at the Woodlawn Liquor Store, in that he was waiting in a stolen vehicle to be used as the get-a-way car on the night of the holdup." This statement of the informant contradicted DePaulo's later testimony at defendant's bail hearing in which he denied having taken any part in the liquor-store robbery. In order to impeach the credibility of DePaulo, defense counsel moved for disclosure of the identity of the informant. Relying upon the state's privilege of nondisclosure of the identity of informants, the trial justice declined to order such disclosure. The defendant contends that this refusal to disclose the identity of the informant constituted a violation of the balancing principles enunciated by the Supreme Court of the United States in *Roviaro v. United States*, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957). In that case the Supreme Court in a nonconstitutional adjudication and in the exercise of its supervisory power[1] required the disclosure of an informant whom the court inferred to have been a participant in a narcotics transaction in which the informant and Roviaro were the sole participants. The Court recognized the existence of a government privilege to withhold from disclosure the identity of persons who furnish information of violations of law, *id.* at 59, 77 S.Ct. at 627, 1 L.Ed.2d at 644, but found that in a case in which the government's informer was the sole participant other than the accused, his possible testimony was "highly relevant and * * * helpful to the defense." *Id.* at 63–64, 77 S.Ct. at 629, 1 L.Ed.2d at 647. Nevertheless, the Court declined to adopt a fixed rule in respect to disclosure of unidentified informants and stated the following principles:

---

1. *McCray v. Illinois*, 386 U.S. 300, 309, 87 S.Ct. 1056, 1061, 18 L.Ed.2d 62, 69 (1967).

"We believe that no fixed rule with respect to disclosure is justifiable. The problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense. Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors." *Id.* at 62, 77 S.Ct. at 628–29, 1 L.Ed.2d at 646.

Later in *McCray v. Illinois*, 386 U.S. 300, 309, 87 S.Ct. 1056, 1061, 18 L.Ed.2d 62, 69 (1967), the Supreme Court traced the development of the privilege with respect to informants' identity and refused to require disclosure of an informant in connection with a motion to suppress when the issue was probable cause as opposed to guilt or innocence. *Id.* at 311, 314, 87 S.Ct. at 1062, 1063, 18 L.Ed.2d at 70, 72. This privilege has been supported by Professor Wigmore in the following terms:

"A genuine privilege, on * * * fundamental principal * * * must be recognized for the *identity of persons supplying the government with information concerning the commission of crimes.* Communications of this kind ought to receive encouragement. They are discouraged if the informer's identity is disclosed. Whether an informer is motivated by good citizenship, promise of leniency or prospect of pecuniary reward, he will usually condition his cooperation on an assurance of anonymity—to protect himself and his family from harm, to preclude adverse social reactions and to avoid the risk of defamation or malicious prosecution actions against him. The government also has an interest in nondisclosure of the identity of its informers. Law enforcement officers often depend upon professional informers to furnish them with a flow of information about criminal activities. Revelation of the dual role played by such persons ends their usefulness to the government and discourages others from entering into a like relationship.

"That the government has this privilege is well established, and its soundness cannot be questioned." 8 Wigmore, *Evidence* § 2374 at 761–62 (rev. ed. McNaughton 1961) (footnotes omitted) (emphasis in original).

This court recognized the informant's privilege in *State v. Cofone*, 112 R.I. 760, 763–66, 315 A.2d 752, 754–55 (1974). Although that case involved a determination of probable cause, the balancing test was adopted when we stated:

"Accordingly, our task is to fashion an approach which will not interrupt the free flow of information to law enforcement officials and at the same time will not bar an accused from presenting a fair defense to the crime charged." *Id.* at 766, 315 A.2d at 755.

Other courts have applied the balancing test when the issue of guilt or innocence was involved and considered the degree or participation of the informer as significant. In *State v. Brooks*, 366 A.2d 179 (Me.1976), the Supreme Judicial Court of Maine observed:

"The presence of the informer at the scene of the alleged crime, or his involvement in the criminal activity for which the defendant is charged, has been viewed as a significant factor in the decision to require disclosure. *See, e. g., Portomene v. United States*, 221 F.2d 582, 584 (5th Cir. 1955); *People v. McShann*, 50 Cal.2d 802, 330 P.2d 33, 35 (1958). Where, however, there is no showing that the informer was connected with the defendant's criminal conduct, but was merely conveying information to law enforcement officials, nondisclosure of his identity is justified. *See, e. g., Cook v. United States*, 354 F.2d 529, 531 (9th Cir. 1965); *Miller v. United States*, 273 F.2d 279, 281 (5th Cir. 1959); *Pegram v. United States*, 267 F.2d 781, 782–83 (6th Cir. 1959); *People v. White*, 16 N.Y.2d 270, 266 N.Y.S.2d 100, 213 N.E.2d 438, 440 (1965); *Lee v. State*, 235 Md. 301, 201 A.2d 502, 504 (1964); *People v. Beattie*, 31 Ill.2d 257, 201 N.E.2d 396, 398 (1964)." *Id.* at 181.

The District of Columbia Court of Appeals noted in *Hamilton v. United States*, 395 A.2d 24, 26 (D.C.1978):

> "The decision to compel disclosure rests within the sound discretion of the trial court, and the burden of proof is entirely on the defendant. A disclosure request must not be based on mere speculation, or suspicion, it must be demonstrated that the informer would have offered testimony helpful to the defense." [Citations omitted].

In the case at bar there is neither evidence nor contention that the informant was a participant in the criminal conduct under consideration. The identity of the informant was sought purely for the purpose of impeaching that portion of DePaulo's testimony wherein he denied participation in the actual holdup. No case has been cited by defendant, nor have we found a case in which the government's privilege of nondisclosure of the identity of an informant has been set aside for the purpose of obtaining testimony respecting a prior challenged statement to be used for the impeachment of a prosecution witness. It should further be noted that the impeachment in this case would have been of limited incremental value. DePaulo's own testimony and the testimony of Lieutenant Collins indicated that DePaulo was a suspect in the holdup and that he assisted in the disposal of Souza's clothing and a gun that Souza had handed to him. Thus, it was obvious that DePaulo was subject to prosecution at least for harboring [2] and aiding and assisting both Souza and Cochrane after he had been informed that they were engaged in a holdup. This obviously provided a motivation for testifying as a prosecution witness. Such motivation was utilized by defense counsel to diminish the credibility of DePaulo as a witness. The incremental advantageous effect of adding impeaching testimony to challenge the credibility of DePaulo at the bail hearing, when he denied participation in the holdup, would have to be balanced against the enhanced knowledge which DePaulo would have had in the event that the jury believed he was an actual participant in the robbery. The extent and value of this incremental benefit was largely a matter of speculation. It was incumbent upon the trial justice to exercise his sound discretion in determining whether to set aside the government's privilege. Following the admonition of the Supreme Court in *Roviaro*, in making this determination, a court should examine "the crime charged, the possible defenses, [and] the possible significance of the informer's testimony * * *." 353 U.S. at 62, 77 S.Ct. at 629, 1 L.Ed.2d at 646. The trial justice after considering these elements declined to set aside the privilege. In so deciding, he did not commit an abuse of discretion. The defendant's contentions that this decision deprived defendant of his right to prepare a defense or to cross-examine effectively are without merit.

## II

## MIDTRIAL BLOOD–TEST ORDER

Immediately after defendant's arrest on April 29, 1976, the Pawtucket police secured a warrant to seize a sample of blood from Anthony Souza. At a hearing to consider a pretrial motion to quash, the trial justice found that the affidavit upon which the warrant was issued did not meet the tests for factual assertions established by *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). The trial justice went on to comment that there were ample facts in the possession of the Pawtucket police to establish probable cause but that insufficient information was imparted in the written affidavit to the District Court justice who issued the warrant in order for him to make an "impartial, neutral, and independent judgment that probable cause existed."

██ Thereafter, in the course of the trial, on January 26, 1977, while defense counsel was engaged in cross-examination of the prosecution witness DePaulo, the state

---

**2.** General Laws 1956 (1969 Reenactment) § 11–1–4.

presented to the trial justice an application for the seizure of a blood sample from defendant. · This application was supported by an affidavit, the sufficiency of which is not challenged on appeal. The trial justice granted the seizure order not only on the basis of the affidavit submitted but also took into account the testimony which had been presented up to that point in the course of the trial. The defendant argues that the granting of this midtrial seizure order was a violation of the fruit-of-the-poisonous-tree principles first enunciated in *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920). He further argues that the burden of proof was clearly upon the state to show that the probable cause relied upon by the state in seeking the second order was untainted by the information previously suppressed. *See, e. g., Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *Nardone v. United States*, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939). The defendant contends that the trial justice did not resolve the question of the burden of proof. We disagree with this latter contention. The trial justice stated in the course of his decision on the motion to order the taking of the second blood sample:

"It would seem to me that there is, on the record before me, independent of the results of any examination heretofore suppressed to raise probable cause to believe [sic] that if the court permitted the intrusion of the defendant Souza's body, then an examination of his blood type would result in a finding that it was 'A' type. The Court has presently before it testimony of an officer that he shot a defendant who was fleeing the scene of a robbery. That that defendant left a trail of blood for approximately four-fifths of a mile, in a circuitous route from an area across the railroad tracks to 424 Lonsdale Avenue. An exhibit in this case indicates that there is a larger accumulation of blood on the porch, inferentially indicating that the person who was bleeding paused for some time at the door. There is evidence that the defendant, Souza, was armed that evening. There is evidence before the Court from Mr. DePaulo that he saw the defendant bleeding from the left forearm, that he treated that [wound], that the defendant Souza told DePaulo that there has been an exchange of shots. The time sequence from the time of the robbery commencing at 9:45 terminating some time at the beginning of the shooting and the arrival, according to the testimony of DePaulo, of the defendant Souza, in the Court's mind, supplements the affidavit and confirms the information in the affidavit, and accepting the representation made in the affidavit of Chief Roy that a scientific examination of the evidence disclosed that the blood type on the leaves is blood type 'A' * * * established a relevancy basis for the admission into evidence of the blood type of this defendant."

The foregoing comment by the trial justice clearly indicates that he determined that the state had sustained the burden of proof of showing probable cause for the taking of a blood sample without relying upon any of the results of the prior test that had been suppressed. We cannot say that this finding of fact by the trial justice was clearly wrong.

The defendant argues that the timing of this request upset his trial strategy. A trial strategy may not inhibit the presentation of relevant truths which are otherwise admissible. *See State v. Cline*, R.I., 405 A.2d 1192, 1210 (1979). Moreover, defendant did not request of the court a continuance or opportunity to obtain evidence to rebut the expert finding of Dr. DeFanti, who testified that defendant's blood type matched the blood type of the sample taken by police officers on the night of the robbery. In the offer of proof submitted by counsel for defendant, indication was made that cross-examination might have differed in the event that the blood sample had been taken prior to trial. However, no effort was made to recall any of the witnesses in order that such cross-examination might have been reopened.

There is no question that a court may, upon a showing of probable cause, issue an order authorizing the taking of a blood sample from a person who has been charged with or suspected of a criminal offense, in respect to which the blood sample is determined to be relevant. *See Schmerber v. California,* 384 U.S. 757, 760–62, 86 S.Ct. 1826, 1830–31, 16 L.Ed.2d 908, 914–15 (1966). It is true that the timing of the request in this case was somewhat unusual in that it came during the course of a trial. However, scientific tests and demonstrations may be ordered by a trial justice during the course of a trial on any matter that does not impinge upon the privilege of the defendant against self-incrimination. *See United States v. Wade,* 388 U.S. 218, 227–28, 87 S.Ct. 1926, 1932–33, 18 L.Ed.2d 1149, 1157–58 (1967). Under all of the circumstances of this case, we conclude that the trial justice did not abuse his discretion in ordering the taking of a blood sample during the course of defendant's trial.

### III

### THE SUPPLEMENTAL CHARGE

After the jury had deliberated in excess of ten hours over a period of two days, the foreman requested of the trial justice that the testimony of the chief prosecution witness, Robert DePaulo, be reread. This request was granted, and thereafter the jurors resumed deliberations for an additional one and three-quarter hours before being allowed to retire for the evening at approximately 5:10 p. m. In the note which requested the reading of the DePaulo testimony, the jury indicated that "this may clarify some doubts that are keeping us from reaching a decision." The jurors had agreed to resume deliberations on the following day, which was a Sunday. Prior to the resumption of deliberations shortly before noon on that day, the trial justice gave

to the jury a supplemental instruction. Reminding the jury of the desirability of achieving a unanimous verdict, he admonished them: "You will recall you were reminded not to give up convictions that you held firmly." He also told the jury, "If you are genuinely divided on issues which prevent you from reaching a verdict or all verdicts in this case at four o'clock today, I will accept from you that you are hopelessly hung, and will discharge you."

The defendant argues that this charge was coercive, and in that category of instruction which is sometimes referred to as the *Allen* charge, which was upheld by the Supreme Court in *Allen v. United States,* 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896). This type of charge has been widely criticized in later years, particularly for its reference to the duty of the minority to consider with great care the opinion of the greater number of jurors. *See State v. Patriarca,* 112 R.I. 14, 51–52, 308 A.2d 300, 322 (1973). *See also e. g., State v. Thomas,* 86 Ariz. 161, 342 P.2d 197 (1959); *State v. Randall,* 137 Mont. 534, 353 P.2d 1054 (1960); *American Bar Association Standards for Criminal Justice,* Standard 15–4.4 and comment (2d ed. 1980).

Indeed, in *Patriarca,* we suggested that consideration be given to compliance with § 5.4(a) and (b) of the ABA Standards.[3] Our suggestion was couched in the following terms:

"It is our opinion that this case demonstrates the need for a solution to forestall continued litigation over the validity of the *Allen* charge. Such a solution, in our opinion, is to be found in the *A.B.A. Project on Minimum Standards for Criminal Justice, Trial by Jury,* § 5.4(a) and (b) (approved draft 1968). That section provides that before deliberation the court may instruct the jury: (1) that in order to return a verdict, each juror must agree thereto; (2) that jurors have a duty to

---

3. We note that since our 1973 decision in *State v. Patriarca,* 112 R.I. 614, 308 A.2d 300 (1973), the 1968 Approved Draft has been revised and incorporated into the *American Bar Association Standards for Criminal Justice* (2d ed. 1980). Former § 5.4 has been renumbered as Standard 15–4.4. The new version has been slightly altered in style to neutralize gender references. Apart from these changes, however, Standard 15–4.4 is identical to the 1968 Approved Draft version.

consult with one another and to deliberate with a view to reaching an agreement, if it can be done without violence to individual judgment; (3) that each juror must decide the case for himself, but only after an impartial consideration of the evidence with his fellow jurors; (4) that in the course of deliberations, a juror should not hesitate to re-examine his own views and change his opinion if convinced it is erroneous; and (5) that no juror should surrender his honest conviction as to the weight or effect of the evidence solely because of the opinion of his fellow jurors, or for the mere purpose of returning a verdict.

"In an effort to alleviate possible interference with the deliberation of jurors, § 5.4(b) provides that when, in the exercise of his discretion, the trial justice concludes that it is necessary to recharge the jury under circumstances like those presented by the instant case, he may do nothing more than repeat those instructions set out in subsection (a). Without intending to limit the discretion of the trial justice in the matter of instructing jurors as to their duty to seek verdicts in criminal trials, we suggest that consideration be given to compliance with the provisions of § 5.4(a) and (b)." *Patriarca*, 112 R.I. at 53, 308 A.2d at 322–23.

It should be noted that in our suggestion to trial judges, we specifically disclaimed any intention to limit the discretion of the trial justice in instructing jurors as to their duty to seek verdicts in criminal trials. In Rhode Island we do not require that a trial justice read a patterned instruction. It is customary for the trial justice in this state to speak to the jury in ordinary conversational terms, frequently without written notes, in order to achieve the maximum effect of communicating ideas through the use of words. Jury instructions are not given in a vacuum. They must relate to the circumstances of the case and, particularly in respect to supplemental charges, may depend upon the length of deliberation and the questions that have been asked by the jurors. *See State v. Rogers*, R.I., 420 A.2d 1363 (1980). These circumstances may not be determined in advance and may require a response by the trial justice which is not susceptible of being cast in the precise terms recommended by the ABA Standards or the reading of appellate opinions.

Obviously, supplemental charges, like original charges, must be scrupulously fair to the defendant and to the state and must not infringe upon the factfinding province of the jury by coercion or improper suggestion. An examination of the charge given by the trial justice on the third day of deliberation, especially when viewed in the light of his original instructions, clearly shows that it was not coercive and that it did not contain any admonition to minority jurors to give up their convictions in deference to the majority. In fact, no reference was made to minority positions. In this case there is no indication in the record that any disclosure was made with respect to the numerical division of the jury in any event.

■ The defendant, however, argues that the setting of a "deadline" was in itself coercive and should require reversal. It is true that the United States Court of Appeals for the Tenth Circuit has apparently adopted a *per se* rule against the setting of a time limit. *Goff v. United States*, 446 F.2d 623, 626 (10th Cir. 1971); *Burroughs v. United States*, 365 F.2d 431, 434 (10th Cir. 1966). This view has been rejected however, in *United States v. Taylor*, 513 F.2d 70, 72 (5th Cir.), *cert. denied*, 423 U.S. 947, 96 S.Ct. 361, 46 L.Ed.2d 281 (1975), in the course of which the court observed:

"We do not accept the proposition that a time deadline added to an *Allen* charge is in and of itself reversible error. Every *Allen* charge situation must be decided upon the particular facts and circumstances of the individual situation." 513 F.2d at 72.

We believe that the individualized consideration of each set of factual circumstances is a better approach than the adoption of a *per se* rule in respect to time deadlines as well as the propriety of other aspects of judicial instructions.

■ In the case at bar, the jurors had deliberated for two days and were about to begin the third day of their consideration of evidence adduced in a trial that had taken place over a thirteen-day period, exclusive of the extensive voir dire examination of the jurors. In the event that the trial justice had not indicated a time for the ending of deliberations, it might well have been argued that the jurors would infer that they might be required to reach a verdict upon pain of being forced to deliberate for several days. The trial justice in this case made it clear to the jurors that if they had not reached a unanimous verdict by 4 p. m. on that final day of deliberations, he would accept the fact that they would be unable, in spite of their conscientious efforts, to reach a determination regarding guilt or innocence. Thus, viewed as a whole, the judge's supplemental instruction did not contain the principal elements of the *Allen* charge most often criticized. It reasonably conformed to our admonitions in *State v. Patriarca, supra,* and was not coercive in respect to a time limit or otherwise.

## IV

### THE REDEFINITION OF REASONABLE DOUBT

■ Shortly after the supplemental instruction was given, the jury asked for a redefinition of the term "reasonable doubt." The trial justice, who had already extensively defined reasonable doubt in the initial charge, responded in writing with a series of illustrative definitions concerning what reasonable doubt was and what it was not. The defendant in an elaborate dissection of this instruction contends that there was undue emphasis upon the negative rather than the positive definitions of reasonable doubt. Without attempting to follow each convolution of this argument, suffice it to say that we are convinced that the redefinition of reasonable doubt, particularly when viewed in the context of the original instruction, was well within the standards that have been recognized for the communication of this elusive concept to lay persons who sit on juries. *State v. Lerner,*

112 R.I. 62, 97, 308 A.2d 324, 345 (1973); *United States v. Heap,* 345 F.2d 170, 171 (2d Cir. 1965); *see Jackson v. Virginia,* 443 U.S. 307, 317 n.9, 99 S.Ct. 2781, 2788 n.9, 61 L.Ed.2d 560, 572 n.9 (1979); *Johnson v. Louisiana,* 406 U.S. 356, 360, 92 S.Ct. 1620, 1624, 32 L.Ed.2d 152, 158 (1972); *United States v. Smith,* 468 F.2d 381, 383 (3d Cir. 1972); *Baker v. United States,* 412 F.2d 1069, 1073 (5th Cir. 1969), *cert. denied,* 396 U.S. 1018, 90 S.Ct. 583, 24 L.Ed.2d 509 (1970); *Bishop v. United States,* 107 F.2d 297, 303 (D.C.Cir. 1939).

■ In a footnote, defendant raises for the first time on appeal the issue that defendant was absent during this supplemental instruction on the redefinition of reasonable doubt. Apparently trial counsel did not request that defendant Souza be brought up from the cell block for the purpose of listening to or reading this instruction. Counsel for defendant and the state were present and had an opportunity to object to the legal validity of this instruction. In fact, defendant's counsel preserved an objection to the substance of the definition although he had no objection to the procedure of sending the jury a written explanation of reasonable doubt. Assuming arguendo, without deciding that we could consider an alleged error not raised at the trial, it is crystal clear that had defendant been present, he could have done no more than to suggest to his counsel that the latter object to the substance of the redefinition that had been given to the jury. It is not argued that defendant would have had some legal knowledge superior to his counsel which would have resulted in a different or more advantageous objection than that which was actually made. Thus, if the absence of defendant at the time of transmission of the communication was error, even though not asserted by trial counsel, there is no indication that it was prejudicial to defendant.

■ "So far as the Fourteenth Amendment is concerned, the presence of a defendant is a condition of due process to the extent that a fair and just hearing

would be thwarted by his absence, and to that extent only." *Snyder v. Massachusetts*, 291 U.S. 97, 107–08, 54 S.Ct. 330, 333, 78 L.Ed. 674, 679 (1934).[4] To the extent that Rule 43 of the Superior Court Rules of Criminal Procedure [5] grants a broader right of presence than does the Fourteenth Amendment, it too guarantees substantial as opposed to shadowy or theoretical rights of presence. The rule does not require that a "defendant has a right to be present at all occurrences after the impaneling of the jury—but only to those occurrences that concern the guilt or innocence of defendant or affect his ability to defend against the charges" in the case. *State v. LaChappelle*, 424 A.2d 1039. (R.I.1981). Under either test there was no violation of any substantial right of the defendant in the case at bar.

After the briefs had been filed in this case, defendant moved for dismissal of the indictment or a limited remand to the Superior Court for a determination of whether the indictment should be dismissed pursuant to a challenge to the composition of the grand jury which returned said indictment in the light of our holding in· *State v. Jenison*, R.I., 405 A.2d 3 (1979). This motion was scheduled for oral argument on the same date upon which the merits of the other issues raised on appeal were heard, namely, October 9, 1980. On that same date we entered an order which clarified our holding in *State v. O'Coin*, R.I., 417 A.2d 310 (1980), in which we had addressed the question of the retroactive application of the *Jenison* rule. This order read as follows:

"In *State v. O'Coin*, R.I., 417 A.2d 310 (1980) we said a defendant wishing to challenge the constitution of a grand or petit jury must do so by filing a motion

prior to trial pursuant to Super.R.Crim.P. 12(b)(2), (3) the provisions of which require that such a motion be made within twenty-one days after a plea is entered. In the event that such a motion is made prior to trial, but more than twenty-one days after a plea is entered, it is within the sound discretion of the trial justice to consider the motion if it is filed within a reasonable time after entrance of a plea." *State v. O'Coin*, 417 A.2d 310 (1980).

■ The foregoing order set forth in explicit terms that the only defendants who might benefit from the *Jenison* rule were those who, before trial, had challenged the composition of the grand or petit jury by filing an appropriate motion. In this case defendant filed no such motion at any time prior to or during trial. Consequently, the issue is improperly before this court, *State v. Gibbons*, R.I., 418 A.2d 830, 838 (1980), and the Superior Court would no longer have jurisdiction to entertain such a motion. Thus, defendant's motion to dismiss the indictment or for a limited remand to the Superior Court is denied.

For the reasons stated, the appeal of the defendant is denied and dismissed, the judgment of conviction is affirmed, and the papers in the case may be remitted to the Superior Court.

---

4. We have held in *State v. Brown*, R.I., 399 A.2d 1222, 1224 (1979) that a

"criminal defendant does have the right, both under the sixth amendment and the due process clause of the fourteenth amendment, and art. I, § 10 of the Rhode Island Constitution to be present at all stages of his trial where his absence may affect the fairness of the proceedings." [Citations omitted].

5. Rule 43 of the Superior Court Rules of Criminal Procedure reads in pertinent part as follows:

"The defendant shall be present at the arraignment and at the imposition of sentence, except as otherwise provided by these rules. The defendant shall be present at every stage of the trial, including the impaneling of the jury and the return of the verdict * * *."