**STATE**

v.

**Richard PIGNOLET.**

**No. 81–159–C.A.**

Supreme Court of Rhode Island.

Sept. 1, 1983.

Reargument Denied Sept. 1, 1983.

Dennis J. Roberts, II, Atty. Gen., Judith Crowell, Sp. Asst. Atty. Gen., for plaintiff.

Francis X. Flaherty, Butterfield & Flaherty, Warwick, for defendant.

## OPINION

SHEA, Justice.

This is a criminal case in which the defendant was found guilty on six counts of second-degree sexual assault and two counts of assault with intent to commit sexual assault. The defendant was sentenced to three years on the counts of second-degree sexual assault and five years on the remaining counts, the sentences to run concurrently. He now appeals his conviction. We affirm.

The evidence established that Eleanor,[1] the complaining witness, is a stepdaughter of defendant. The assaults took place during the summer and fall of 1979. At this time, Eleanor lived in a rural area with her mother, stepfather, sister, and brothers. Eleanor's mother worked nights and was not at home when the assaults took place. At the time of the assaults, Eleanor was fourteen years of age.

The evidence established that all of the assaults took place at home, in the evening, after the other children had gone to sleep. The first incident occurred in the parlor. The defendant told Eleanor to sit next to him on the sofa, which she did. He then put his hand around her waist and up inside her shirt. She tried to get away, but he pulled her back down. He then removed her shirt and bra and touched her breasts while she cried and continued to try unsuccessfully to get away from him. He warned her that if she told anyone what he had done, he would "make [her] life miserable." The evidence established that he was a stern disciplinarian, capable of dispensing harsh physical punishment to his stepchildren.

The second incident occurred on July of 1979 when, after the other children had gone to bed, defendant again removed Eleanor's shirt and bra and fondled her breasts as she cried. Again, she tried to get up and get away from him, but he pulled her back down beside him. This time defendant told Eleanor that if she allowed him to do what he wanted, he would grant her certain privileges.

On the night of the third assault, after Eleanor had gone to bed, defendant woke her up and told her to do the dishes, which she did. However, when Eleanor tried to return to bed, he told her to stay up; he kept her up with him until her older brother had retired. After her brother had gone to bed, Eleanor was told by defendant to sit on the couch next to him. The defendant then pulled Eleanor down beside him, removed her shirt and bra, and touched her breasts.

1. This is not her real name.

The fourth incident also occurred at night after Eleanor had gone to bed and had fallen asleep. The defendant came into her bedroom, told her to get up and go into the parlor, which she did. He then told her to go to his bedroom and get into his bed. He then got into bed and removed her clothing and his own. Eleanor started to cry. The defendant got on top of her, placed his penis between her legs, and attempted to push her legs apart. She pleaded "No" and began to cry harder. The defendant then told her "[she'd] have to do it sooner or later because some day, he'd do it by force."

The fifth incident occurred in September of 1979. Like the others, it occurred at night while the other children were asleep and the mother was working. Again, he ordered Eleanor to go into the parlor and sit on the couch, which she did. He removed all of her clothing and again got on top of her. Eleanor cried and attempted to get away from defendant, but he pushed her back down.

The sixth assault took place during October in the parlor, at night, again on the couch. The defendant removed Eleanor's clothing and his own, got on top of her, and attempted to push her legs apart with his own. Eleanor pushed him off her.

These assaults upon Eleanor came to light when, despite her fear of her stepfather's retaliation, she mustered enough courage to tell her mother what had been happening to her. The mother immediately took Eleanor and the other children and left the home that they had shared with defendant.

At trial, Eleanor's thirteen-year-old sister, Nancy,[2] testified for the state. Nancy stated that in September of 1976 when she was nine years old, defendant called her into his bedroom and told her to undo her pants. As she was doing so, he told her if she told anyone what he was doing, he would "drown her at the beach." Before she finished unbuttoning her pants, her grandmother returned home and the incident ended.

Two other incidents about which Nancy testified occurred in the fall of 1979 during the evening hours. On the first occasion, Nancy and defendant were seated on the couch in the parlor watching television. The defendant pushed Nancy into a reclining position on the couch, then lay down behind her and pressed against her. Nancy was frightened, but nothing further happened because the episode was interrupted by her mother's return home. The second incident was substantially the same except that it ended when Nancy burst into tears when defendant made her lie down on the couch. She knew that defendant was assaulting her sister, and she feared that he would do the same to her. When she began to cry, defendant permitted her to go to bed.

At trial, defense counsel sought to preclude the state from offering Nancy's testimony. The trial justice first heard her testimony in a hearing on a motion in limine, out of the presence of the jury. The trial justice ruled that the testimony was admissible under this court's decision in *State v. Jalette,* 119 R.I. 614, 382 A.2d 526 (1978), because it tended to show a lewd or wanton predisposition and intent or motive on the part of defendant toward his two stepdaughters.

On appeal, defendant claims that the trial justice committed prejudicial error by admitting the sister's testimony. We disagree.

■ Generally, evidence of independent, past criminal behavior unconnected with the crimes for which the defendant is on trial may not be used to show commission of the crime charged even though it is criminal activity of the same type. *State v. Jalette,* 119 R.I. 614, 624, 382 A.2d 526, 531 (1978). There are, however, many exceptions to this rule of evidence. *See McCormick's Handbook of the Law of Evidence,*

**2.** This is not her real name.

§ 190 (2d ed. Cleary 1972). In fact, this court has stated that

"[w]hile it is the rule that in the trial of a criminal offense evidence of other and distinct criminal acts is generally prejudicial and inadmissible, yet it is generally conceded that evidence of *other acts, representations and conduct* at different times, *even of a criminal nature,* may be received when they are interwoven with the offense for which the defendant is being tried, or directly support a finding of guilty knowledge in the perpetration of that offense. Any circumstance that is incidental to or connected with the offense under investigation in such a way that it tends to establish guilty knowledge, intent, motive, design, plan, scheme, system, or the like, is proper evidence according to the overwhelming weight of authority." *State v. Colangelo,* 55 R.I. 170, 173–74, 179 A. 147, 149 (1935). (Emphasis added.)

In *State v. Jalette,* 119 R.I. 614, 382 A.2d 526 (1978), this court specifically applied these principles to cases involving sexual offenses against children. In *Jalette,* we quoted the rule enunciated in *People v. Kelley:*

"[E]vidence that the accused committed nonremote similar *sexual offenses with persons other than the victim* may be admitted to prove the presence of the traditional exceptions to the general rule, [exclusion of evidence of other crimes] such as intent or motive, with a caveat that evidence of other acts with other persons may be shown on the issue of intent only if it is absolutely necessary, such as instances where the accused admits the act but claims it was an accident or mistake * * *." (Emphasis added.) *State v. Jalette,* 119 R.I. at 627, 382 A.2d at 533. (quoting *People v. Kelley,* 66 Cal.2d 232, 240–43, 57 Cal.Rptr. 363 at 370–73, 424 P.2d 947 at 954–56 (1967)).

When adopting the holding in *Kelley,* however, this court relaxed the standard for admission of this type of evidence. We stated that rather than show *absolute* ne-cessity for such material, evidence of this type "should be sparingly used by the prosecution and only when *reasonably* necessary. * * * The trial court should exclude such evidence if it believes it is purely cumulative and not essential to the prosecution's case. Evidence of other crimes is admissible only when it tends to show one of the exceptions to which we have previously alluded and only when that exception is relevant to proving the charge lodged against the defendant." (Emphasis added.) *State v. Jalette,* 119 R.I. at 627, 382 A.2d at 533.

Applying these principles to the case before us, we feel that the trial justice apparently complied in every particular with the directions of this court in *Jalette* when he admitted this evidence. The victim had testified to the eight separate acts and attempts of first- and second-degree sexual assault to which we have previously referred. These incidents occurred most often on the living-room couch while defendant and Eleanor watched television. Each incident occurred late in the evening after Eleanor's brothers and sister had gone to bed, and while her mother was away at work. At this time, she and her brothers and sister were in the custody and control of defendant, their stepfather. The defendant had been married to the victim's mother for six years and had established himself as a stern man, demanding of the children and capable of striking them with a hand or belt. In fact, Eleanor said that he had once threatened to shoot her. She also said she was afraid he would "beat her up" if she did tell. Understandably, the victim was afraid of her stepfather.

Nancy's testimony indicates that defendant's conduct toward Eleanor was not a series of isolated incidents but instead was part of an ongoing pattern of behavior that defendant exhibited toward both of his young stepdaughters. Initially, Nancy testified about an event that had occurred in their Johnston home. The defendant called the then-nine-year-old girl to his bedroom and ordered her to remove her pants, threatening to "drown her at the beach" if

she related the incident to anyone. She had reason to fear his threats, for in the past defendant had struck her not only with his hand but also with a belt. The incident was, without question, an intended sexual assault that was prevented only by the unexpected return of the grandmother.

Nancy's testimony detailing the next two attempted assaults echos the episodes related by the victim. The attempted assaults occurred during the same period that the assaults for which defendant was on trial occurred. Nancy testified that one evening while she and defendant were watching television, defendant first ordered, then pushed, her into a reclining position on the couch. He then pressed his body against hers. Nancy cried because she knew that defendant had assaulted her sister Eleanor and she realized that he intended to assault her as well. The knowledge of her sister's experience, coupled with the memory of the prior threat of drowning in Johnston, gave this witness sufficient cause to fear defendant. Again, only the timely return of the girl's mother prevented the assault. The witness testified that this scenario was repeated again approximately two weeks later, terminating, however, when Nancy burst into tears.

■ Although this court has not yet held that evidence of a defendant's sexual conduct with a child not named in the indictment is admissible in an action charging a sexual offense against the named child, a number of other states have held that such evidence is admissible.[3] We have not yet been confronted with a case like this, in which the uncharged conduct is so closely related in time, place, age, family relationships of the victims, and the form of the sexual acts. Here, both children lived in the same house with defendant, and all but one of the sexual acts took place during the same period. Like Eleanor's claim, two of the incidents narrated by Nancy occurred in the home, late in the evening, while the mother was away working, and when other siblings had been sent to bed. Also like Eleanor's experience, the attempted sexual assaults on Nancy occurred under threats of violence. However, unlike Eleanor, this child was fortunate because on two of the three occasions, the timely return home of an adult prevented the completion of the assaults.

The minority believes that the incidents on the couch with the victim's sister were irrelevant because they were not clearly criminal. We cannot agree. This court has never stated that the evidence of other acts, representations, or conduct at different times be confined to crimes alone. *See* *State v. Pule,* R.I., 453 A.2d 1095, 1097–98 (1982). In fact, *Colangelo* clearly contemplates that such evidence is admissible even though it may concern acts of a "criminal nature" as long as it is relevant, probative, and material to establishing the guilty knowledge, intent, motive, design, plan, scheme, or the like. *State v. Colangelo,* 55 R.I. 170, 174, 179 A. 147, 149 (1935).

The minority also suggests that the Johnston incident was too remote to come within the ambit of this exception since that episode occurred three years prior to trial. Again, we disagree. Remoteness is relative, depending upon the circumstances and the conduct in question. The period of three years might be too long if the similar acts were breaking and entering or possession of drugs or a weapon. But here, where the similar acts involved sexual abuse of young girls, stepdaughters of defendant, with whom they lived and in whose custody and control they were left by their mother, the incident that occurred three years before the trial date is not remote, rather it is

---

3. *E.g., State v. Parker,* 106 Ariz. 54, 470 P.2d 461 (1970); *State v. Phillips,* 102 Ariz. 377, 430 P.2d 139 (1967); *Staggers v. State,* 120 Ga.App. 875, 172 S.E.2d 462 (1969); *Commonwealth v. King,* 387 Mass. 464, 441 N.E.2d 248 (1982); *Commonwealth v. Gallison,* —— Mass. ——, 421 N.E.2d 757 (1981); *State v. Anderson,* Minn., 275 N.W.2d 554 (1978); *State v. Dalton,* 587 S.W.2d 644 (Mo.Ct.App.1979); *Hendrickson v. State,* 61 Wis.2d 275, 212 N.W.2d 481 (1973); *Elliott v. State,* Wyo., 600 P.2d 1044 (1979).

a part of a continuing practice of sexually abusing these girls.

We find that this evidence was neither irrelevant nor remote. Both later incidents, coupled with defendant's first assault attempt, are relevant, material, and highly probative of defendant's lecherous conduct toward these young girls over whom he exercised discipline, control, and supervision. With proper instruction, and where reasonably necessary for the state to meet its burden of proof, the testimony of siblings of tender years, similarly situated and similarly abused, is relevant, probative, and admissible corroborative evidence. Even though this precise situation was not before the court in *Jalette,* the language used by the court in that case clearly contemplates the situation before us.

■ The trial justice here recognized the potential prejudice to defendant and applied the test of *Jalette.* The state argued that the evidence was necessary to prove its case. The trial justice was fully justified in accepting that argument at that point in the trial. The victim had testified. There was no indication in the record that defendant would take the stand. The prosecutor represented to the court that she believed the evidence of the sister was necessary to meet the state's burden of proof. We may disagree in retrospect about its necessity, but the test we must apply is what appeared to be reasonably necessary to the trial justice at the time. In this case, defendant did testify. He denied any sexual contact at all with the victim and her sister. Nancy's testimony, without question, would have been admissible in rebuttal. Furthermore, the trial justice properly instructed the jury concerning the use of this evidence in their deliberations.

As indicated earlier, this kind of evidence of similar conduct with young children living in the same household has been admitted in numerous cases from other jurisdictions.[4]

The Supreme Court of Minnesota, in approving the admission of this kind of evidence, best expressed our reasons for the admission in this case:

"(b) the relation of the other offenses to the offense charged was substantial, (c) the evidence was highly relevant, (d) the evidence was not admitted for the purpose of suggesting to the jury that defendant should be convicted because he had a propensity to commit crimes, (e) the state introduced the evidence because it legitimately felt that it needed the evidence to meet its burden of proof * *, (g) the trial court carefully cautioned the jury about the use of the evidence. Under the circumstances, the trial court did not err in admitting the evidence." *State v. Anderson,* Minn., 275 N.W.2d 554, 555–56 (1978); *State v. Billstrom,* 276 Minn. 174, 149 N.W.2d 281 (1967).

The defendant also asserts that the trial justice was in error when he instructed the jury that the degree of resistance a victim must offer in a sexual-assault case may be affected by the familial relationship between the victim and the defendant, in this case, her stepfather. He argues that the common law can be impliedly repealed or altered by a statute that undertakes to revise the entire subject matter, and he points out that G.L.1956 (1969 Reenactment) § 11–37–1, as enacted by P.L. 1979, ch. 302, § 2, is such a statute. The defendant therefore contends that his acts must be judged solely by the statutory standards, specifically those defining force and coercion established in § 11–37–1.[5] He argues that the trial justice erred in his jury instruction when he constantly referred to the conduct of defendant and the alleged victim in terms of standards consistent with the common-law crime of rape. However, defendant overlooks the fact that the statutory provision of § 11–37–12, entitled "Resistance," also provides:

---

4. *See infra,* n. 3, and cases cited therein.

5. For the text of G.L.1956 (1969 Reenactment) § 11–37–1, as enacted by P.L.1979, ch. 302 § 2, see Appendix.

"In any prosecution brought under this chapter it shall not be necessary to prove that the victim physically resisted the actor if the victim reasonably believed that such resistance would be useless and might result in his or her serious bodily injury."

In the case before us, after instructing the jury on the issue of resistance, the trial justice added the following:

"[I]n a situation where the constraints of family discipline exist, and the child in the family is in the habit of showing obedience to a stepfather who is the head of the household, the case must be examined in a somewhat different light. How a more mature and liberated female might have reacted under the circumstances is not in point. The question is whether or not under the peculiar circumstances of this case, if you believe from all the evidence that the defendant did commit these acts, were any acts of assault with intent to have sexual intercourse being carried out with the consent of [Eleanor], or was her power of resistance overcome by her sense of discipline exercised by her stepfather over her? You should consider that element in your verdict as to each count. Where submission of a girl is induced through the coercion of one whom she is accustomed to obey, such as a parent or one standing in loco parentis, such as a stepfather, the law is satisfied with something less than a showing of the utmost physical resistance of which she was capable."

The principle embodied in § 11–37–12 was elaborated on by this court in *State v. Carvalho*, R.I., 409 A.2d 132 (1979). We held that

"[T]oday the law does not expect a woman, as part of her proof of opposition or lack of consent, to engage in heroics when such behavior could be useless, fruitless, or foolhardy. * * * All that is required is that the woman offer such resistance as seems reasonable under all the circumstances. * * * A variety of factors must be considered, such as the comparative strength of the parties, the age and condition of the victim, and the degree of force exhibited by the assailant. If the woman believes that the resistance will lead to her being seriously injured, she is not required to test out this theory by screaming out or exhibiting force against the attacker." *Id.*, 409 A.2d at 135–136.

We believe that the instruction given falls within the guidelines established in *Carvalho*. The defendant fails to recognize that a judge is not limited to the precise language of the statute when instructing a jury. Rather, to perform this function properly, a trial justice must explain the law in the most understandable terms for the jury's guidance and deliberation. In this case, the trial justice did no more than point to factors that the jury was required to consider in judging the victim's resistance to the alleged acts of defendant. It seems clear to us that among the "variety of factors" to be considered would be the relationship between the victim and defendant and defendant's degree of control and discipline over her. We do not believe there was any error in the instruction given.

The defendant next asserts that the trial justice erred in denying defendant's motion for judgment of acquittal. The defendant argues that it is the burden of the state to present at least some evidence on each and every element of the offense charged and that nothing in the testimony could give rise to an inference that the alleged victim was overwhelmed, overpowered, or otherwise overcome by physical force consistent with the statutory definition. The trial justice, he argues, erred when he determined that the alleged physical contact testified to, coupled with the family relationship between the two, was sufficient to constitute an "overcoming."

In considering a motion for judgment of acquittal, the trial justice must review the evidence that the state claims provides the basis for submitting the case to the jury. All inferences are to be drawn in

favor of the state. If the evidence, so viewed, without regard to weight or credibility, is not sufficient to warrant a jury's finding guilt beyond reasonable doubt, the motion should be granted. *State v. Dionne,* R.I., 442 A.2d 876, 883 (1982) (citing *State v. Golden,* R.I., 430 A.2d 433, 436 (1981)). *See also State v. Giordano,* R.I., 440 A.2d 742, 746 (1982).

■ Our review of the record satisfies us that the state presented sufficient evidence. Eleanor's testimony that defendant pulled her down; that he physically prevented her from getting away from him; that he attempted to push her legs apart with his own so that he could penetrate her was sufficient, under Rhode Island decisions, to establish that the sexual activity was "by force or coercion" rather than by consent. There was adequate evidence that this fourteen-year-old stepdaughter of defendant was "overcome" by his advances and that she did not consent willingly to his advances. There is no merit to defendant's argument on this issue.

Finally, defendant argues that a supplemental instruction to the jury by the trial justice shifted the burden of credibility to defendant and deemphasized the state's burden of proof. We do not agree.

On the day the deliberations began, the jury had deliberated for about three hours when they were excused until the following morning. The trial justice gave the appropriate instructions not to discuss the case during the recess. The next morning, after he had determined that the jurors had followed his instruction not to discuss the case, the trial justice then gave a supplemental instruction as follows:

"[Y]ou saw [Eleanor], and you heard her testify. Do you believe that she told you the truth, or do you think she lied to you? You saw Richard Pignolet on the witness stand and you heard his testimony. Do you believe that he told you the truth or do you believe that he lied to you? Now, these are determinations that you as jurors have to make. It's entirely up to the jury to determine the credibility of witnesses."

The defendant argues that in the absence of any question from the jury, the giving of the supplemental instruction was error.

■ Generally, the decision to give a supplemental instruction, or to refrain from doing so, rests within the sound discretion of the trial justice, and he need not limit himself to answering questions from the jury. *See State v. Souza,* R.I., 425 A.2d 893, 899–901 (1981) and *State v. Rogers,* R.I., 420 A.2d 1363, 1366–68 (1980). As long as the supplemental charge is "scrupulously fair to the defendant and to the state" and does "not infringe upon the factfinding province of the jury by coercion or improper suggestion," the giving of a supplemental charge is not improper. *State v. Souza,* 425 A.2d at 900.

■ The supplemental instruction of the trial justice on the issue of credibility appears to have met the guidelines established in *Souza.* The defendant had taken the stand and had denied committing the offenses with which he was charged. Therefore, the credibility of the witnesses was a central issue that the jury had to resolve. The supplemental instruction related directly to the circumstances of the case, was fair to both the defendant and the state, and did not, in our opinion, impair the impartiality of the trial.

For the foregoing reasons, we conclude that there was no prejudicial error in the trial. The appeal of the defendant is denied and dismissed, and the conviction is affirmed. The papers of the case are remanded to the Superior Court for further proceedings.

KELLEHER, Justice, with whom BEVILACQUA, Chief Justice, joins, dissenting.

My basic disagreement with the majority stems from my belief that the rationale that led to *Jalette* has been laid to its eternal rest without benefit of so much as a eulogy. I also have some doubt about whether the two episodes on the parlor

couch can properly be classified as attempted assaults, especially in light of remarks made by the trial justice when he was considering whether or not he would allow Nancy to testify and later when he gave his charge to the jury.

The trial justice observed that the "pants" episode was in and of itself "too remote. But in view of the fact there are two other incidents at least, since that, then there is a continuity that would overcome the remoteness." Later, when the trial justice charged the jury and arrived at the point where he discussed Nancy's testimony, he told the jury, "None of these incidents that she referred to amounted to criminal conduct."

Whether the two parlor episodes can be classified as criminal or noncriminal behavior might be subject for debate, but I have no doubt that *Jalette* was written for the express purpose of barring the indiscriminate use of evidence of "other crimes" since such evidence presents a substantial risk to an accused's right to a fair trial, especially when the other evidence suggests sexual misconduct. When considering the constitutional guarantee of a fair trial, the difference between *Kelley's* "absolutely necessary" standard and *Jalette's* admonition that "this type of evidence should be sparingly used * * * and only when reasonably necessary" is one of semantics.

In his charge, the trial justice did not tell the jury that Nancy's testimony was admissible because it tended to show a lewd and wanton disposition on defendant's part, but rather he said that the sole purpose of her testimony was to assist them in determining "the defendant's intent or motive in the instances with [Eleanor], the older sister." In my opinion, at no time did the trial justice give any consideration to the necessity for presenting Nancy's testimony. The jury had a simple issue to decide without having Nancy brought into the trial. Eleanor told a story that has been detailed by my Brother Shea. The defendant, whom Eleanor referred to at trial as "my father,"

denied that the events described by Eleanor had ever occurred.

The record clearly indicates that defendant's state of mind relating to any one of the six incidents in question was never in issue. It was obvious to all that defendant was not relying on any novel defense such as an accidental or mistaken touching. The single defense witness was defendant, who denied that he had engaged in any incestuous conduct whatsoever with either Eleanor or Nancy.

The prosecution anticipated the defense because as soon as defendant had concluded his testimony, the state placed on the stand the industrial relations manager of a manufacturing plant in nearby Connecticut where defendant worked. She produced personnel records that might have cast a cloud on defendant's claim in his direct examination that he was at work in August 1979 at the time one of the incidents described by Eleanor allegedly occurred. The record indicates that defendant and the manager both testified to this point during the morning of October 7, 1980.

Not only did the trial justice overlook the necessity factor but he also failed to make a determination about whether the probative value of Nancy's testimony was outweighed by its potential for unduly prejudicing defendant in the minds of the jury. *See State v. Bracero*, R.I., 434 A.2d 286, 292 (1981). Professor Moore, in discussing the provisions of Fed.R.Evidence 404(b) which relates to the use of evidence of other crimes, wrongs, or acts, emphasizes that before such evidence is admitted, the danger of undue prejudice to the defendant must be balanced against the probative value of the proffered evidence. 10 Moore, *Federal Practice* ¶ 404.21[2] at IV–114 (1982 ed.).

All too often the obligation to balance is forgotten as the trial justice decides whether or not the situation fits into one of the categories in which evidence has been recognized as having relevancy, and in the process, the duty of protecting the accused from undue prejudice goes by the boards. Thus, an offer of evidence of other crimes

not only offers a problem of pigeonholing but also involves balancing, on one side, the actual need for such type of evidence and, on the other, the degree to which the jury will probably be roused by the evidence to uncontrolled hostility. Discretion implies not only leeway but also responsibility. McCormick, *Evidence* § 190 at 553–54 (1981).

I share the majority's concern that such lecherous conduct as is described in the majority opinion should not go unpunished, but I am also concerned that the jury's guilty verdict was based on its belief that, because of the 1976 "pants and drowning" episode, defendant appeared to be a bad man and an individual who was quite likely to commit the transgressions with which he was charged by the state.

Since I believe that the trial justice's allowance of Nancy's testimony was unsupported by case law, I would sustain the defendant's appeal, particularly since I cannot conclude from this record that the admission of the evidence relating to Nancy was harmless.

### APPENDIX
General Laws 1956 (1969 Reenactment) § 11–37–1, as enacted by P.L.1979, ch. 302.

"DEFINITIONS.—The following words and phrases when used in this chapter shall mean:

'Actor'—a person accused of a sexual assault.

\*     \*     \*     \*     \*     \*

'Victim'—the person alleging to have been subjected to sexual assault.

\*     \*     \*     \*     \*     \*

'Force or coercion'—shall mean when the actor does any of the following:

\*     \*     \*     \*     \*     \*

(B) overcomes the victim through the application of physical force or physical violence.

(C) coerces the victim to submit by threatening to use force or violence on the victim and the victim reasonably believes

that the actor has the present ability to execute these threats.

(D) coerces the victim to submit by threatening to at some time in the future murder, inflict serious bodily injury upon or kidnap the victim or any other person and the victim reasonably believes that the actor has the ability to execute this threat."