**STATE**

**v.**

**Charles E. VANOVER.**

**No. 96–246–C.A.**

Supreme Court of Rhode Island.

Nov. 19, 1998.

Annie Goldberg, Aaron L. Weisman, Providence, for plaintiff.

Catherine A. Gibran, Paula Rosin, Providence, for defendant.

Before WEISBERGER, C.J., and LEDERBERG, BOURCIER, FLANDERS and GOLDBERG, JJ.

## OPINION

LEDERBERG, Justice.

This case came before the Supreme Court on the appeal of the defendant, Charles E. Vanover. Following a jury trial in the Superior Court, the defendant was convicted of two counts of assault with intent to commit robbery, one count of assault with a dangerous weapon, and one count of carrying a pistol without a license. The defendant was sentenced to twenty years, with fifteen to serve, on the assault with intent to commit robbery counts, twenty years suspended and probation on the assault with a dangerous weapon count, and ten years to serve concurrently on the firearm count. For the reasons stated below, we deny and dismiss the appeal and affirm the judgment of the Superior Court. A summary of the pertinent facts follows, with additional details provided in the analysis of the issues raised by this appeal.

### Facts and Procedural History

Thomas Newman (Newman) and his friend Gregory Cabral (Cabral) spent Friday evening December 2, 1994, in a Providence club. When the club closed at 2 a.m. the next morning, Newman drove Cabral's car to South Providence because Cabral wanted to purchase some crack cocaine. A witness, who identified herself at trial as having been

a prostitute at the time of the event, gave Newman and Cabral directions to a nearby drug house in exchange for a promise of a bag of cocaine and followed them to the house on foot. Cabral bought crack, but had no pipe with which to smoke it. A man who called himself "David" approached Cabral's car and offered the use of his pipe. After Cabral and David smoked some crack, the trio drove to another location to obtain higher-quality drugs. On the way back to the first drug house, David instructed Newman to "pull over." When Newman did so, David grabbed Newman by his ponytail, put a gun to his head, and demanded all his money. Cabral, meanwhile, jumped out of the car. The assailant followed Cabral, demanding money and threatening Cabral's life. Cabral refused to comply, whereupon David struck Cabral in the head with his gun, causing a head injury and extensive bleeding, though apparently not from a bullet. David fled the scene, and Newman drove Cabral to Rhode Island Hospital for treatment.

Cabral was unable to identify defendant as his assailant, but Newman had a better recollection of the incident. Newman mentioned to Providence Police Detective Stephen J. Springer that he thought the assailant either had a "chipped tooth" or something else "wrong" with his mouth. On December 4, 1994, the police showed Newman several photographs, one of which Newman selected, explaining that although he did not think that the man was David, his features were very similar to those of the attacker.

Newman was able to identify the woman who had led him to the drug house. In speaking with the woman, Detective Springer learned that she had seen defendant enter the victims' vehicle. On December 5, 1994, the police showed Newman a group of six photographs that included a photograph of defendant. Newman identified defendant as the man who called himself David, stating that he was 90 percent positive of the identification. The police later held a lineup that included defendant, but Newman did not attend. He testified that he had never received any messages from the police asking him to appear in person to make an identification. After bringing defendant to the station, the police photographed defendant's mouth. These photographs were not presented at trial, however, because they allegedly were lost by the police.

The defendant was charged by Criminal Information with six offenses: two counts of assault with intent to commit robbery in violation of G.L.1956 § 11–5–1 (counts one and two), two counts of assault with a dangerous weapon in violation of § 11–5–2 (counts three and four), one count of possession of a firearm while committing a crime of violence in violation of G.L.1956 § 11–47–3 (count five), and one count of carrying a pistol without a license in violation of § 11–47–8(a) (count six). Counts four and five were dismissed voluntarily by the prosecution at the start of trial. The defendant was convicted on the four remaining counts and sentenced to serve fifteen years at the Adult Correctional Institutions, to be followed by a twenty-year probationary period.

Following his sentencing, defendant filed a notice of appeal with this Court claiming two errors: (1) the trial justice committed reversible error in failing to give defendant's instruction on lost evidence; and (2) Newman should have been precluded from making an in-court identification because he was incompetent to do so under Rule 602 of the Rhode Island Rules of Evidence.

### Lost Evidence Instruction

The defendant's first issue, the challenge to the absence of an instruction, is a pure question of law. But whether any prejudice resulted from the lack of the instruction is a mixed question of law and fact. As we have explained, "[t]his Court will review *de novo* legal questions and mixed questions of law and fact insofar as those issues impact on constitutional matters, pursuant to *Ornelas v. United States,* 517 U.S. [690], 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996)." *State v. Campbell,* 691 A.2d 564, 569 (R.I.1997). In *Ornelas,* the Supreme Court held that in such mixed questions, a "policy of sweeping deference" by an appellate court would allow different trial justices to reach different conclusions on constitutional issues in cases in which the facts were substantially the same. *Ornelas,* 517 U.S. at 697, 116 S.Ct. at 1662,

134 L.Ed.2d at 919. The Supreme Court noted that "[s]uch varied results would be inconsistent with the idea of a unitary system of law." *Id.* We therefore review this matter *de novo,* without deference to the trial court's findings.

Here, defense counsel requested that the trial justice instruct the jury, "If you find that the police have lost or destroyed, caused to be destroyed, or allowed to be destroyed evidence whose contents are in issue, you may infer that the true fact is against the interest of the police." After hearing defense counsel's supportive arguments, the trial justice declined to give the requested instruction, explaining that although the defense attorney here would be allowed to argue to the jury the various inferences that could be drawn from the loss, "if there's to be a case where a missing evidence instruction is to be given, I don't think this is the one." In support of his ruling, the trial justice cited *State v. Fenner,* 503 A.2d 518 (R.I.1986). *Fenner* noted that "[i]t is not the function of a trial justice to act as advocate for either the prosecution or the defense. Counsel are given adequate opportunities to argue matters of credibility, including bias, motivation, anticipated benefits or rewards." *Id.* at 525. In the instant case, the jury had the opportunity to consider these issues. Moreover, defendant made no argument or showing that the state's burden of proof was reduced or shifted by not giving the instruction.

It is well settled that had the state suppressed evidence that materially affected questions of guilt or punishment, defendant's due process right to a fair trial would have been violated. *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215, 218 (1963). In cases in which a defendant, as here, has alleged a due process violation resulting from allegedly exculpatory evidence, this Court employs the standard set forth by the United States Supreme Court for dismissal of an indictment on the basis of lost or destroyed evidence. The core cases enunciating this framework are *Arizona v. Youngblood,* 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988), and *California v. Trombetta,* 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984), which hold that in order to prove a violation of due process in circumstances in which potentially exculpatory evidence has been lost, a defendant must show that: (1) the evidence possessed "an exculpatory value that was apparent before the evidence was destroyed;" *Trombetta,* 467 U.S. at 489, 104 S.Ct. at 2534, 81 L.Ed.2d at 422, (2) the defendant would be unable to obtain comparable evidence by other reasonably available means; *id.,* and (3) there was bad faith on the part of the state. *Youngblood,* 488 U.S. at 58, 109 S.Ct. at 337, 102 L.Ed.2d at 289.

This Court specifically considered the issue of the inadvertent suppression of evidence in *State v. Garcia,* 643 A.2d 180 (R.I.1994), and explained that "when evidence is missing or destroyed, '*unless* a criminal defendant can show bad faith on the part of the [state], failure to preserve potentially useful evidence does not constitute a denial of due process of law.' " *Id.* at 185, (quoting *Youngblood,* 488 U.S. at 58, 109 S.Ct. at 337, 102 L.Ed.2d at 289). In an earlier case, *State v. Williams,* 480 A.2d 1383 (R.I.1984), we held that although free to adopt greater due process safeguards than those provided by the federal courts, "we see no reason to depart from the standard enunciated by the *Trombetta* Court." *Id.* at 1390. Therefore, unless a defendant is able to meet the *Youngblood–Trombetta* standard, we shall neither dismiss the indictment nor otherwise penalize the prosecution.

The defendant here conceded that he could not make the showing of bad faith that was necessary to have the indictment dismissed. In his brief, defendant explained that at trial, "defense counsel said he would not argue dismissal of the indictment since *he could make no persuasive showing of bad faith in the loss of the photos.*" (Emphasis added.) The defendant argued on appeal that even if the police acted "in good faith, the loss of this evidence was simply inexcusable." Although the defendant in *Garcia* urged dismissal of an indictment, whereas defendant in this case requested a lost evidence instruction, the issue presented to us is identical. The *Youngblood–Trombetta* standard stresses "the importance for constitu-

tional purposes of good or bad faith on the part of the Government when the claim is based on loss of evidence attributable to the Government." *Youngblood,* 488 U.S. at 57, 109 S.Ct. at 337, 102 L.Ed.2d at 289. In the case before us, the trial justice stated,

> "I tell you from my review of the evidence and from the suppression hearing I find absolutely no bad faith or willfulness on the part of the State or the police officers ***. Was there some negligence? Apparently, there was. I don't disagree with that."

We are of the opinion that absent a showing of bad faith on the part of the state, a lost evidence instruction is not required each time potentially exculpatory evidence has been lost.

Moreover, defendant failed to show that he was prejudiced by the loss or that he was unable to "obtain comparable evidence by other reasonably available means" as required by *Trombetta,* 467 U.S. at 489, 104 S.Ct. at 2534, 81 L.Ed.2d at 422. We note that the *Youngblood* Court critically commented that the defendant in that case declined to perform any tests on evidence that had been preserved from the night of the crime. We, in like manner, point out that defendant here could have removed any question of what the photos might have revealed because he, himself, possessed critical comparable evidence. Newman testified that he had informed the police that he believed his assailant "had a chipped tooth." Detective Springer testified that at the time of defendant's arrest, defendant's front teeth appeared to be "slanting as though possibly a chip had been repaired." Clearly, these statements put the condition of defendant's teeth at issue. The defendant, however, made no effort to prove that these statements were inapplicable or untrue and instead focused exclusively on the loss of the photographs.

Even if the photographs had been exculpatory, it does not follow that defendant was "without alternative means of demonstrating [his] innocence." *Trombetta,* 467 U.S. at 490, 104 S.Ct. at 2534, 81 L.Ed.2d at 423. The defendant claimed that the Polaroid photographs would have shown that at the time of arrest his teeth did not comport with Newman's description of the attacker's teeth as "chipped." But as long as the condition of defendant's teeth remained unchanged between the time of his arrest and the time of trial, the teeth themselves would have constituted comparable evidence. The defendant, then, could ill argue that he was prejudiced by the police's loss of the photographs. In fact, outside the presence of the jury, the trial justice invited defendant to present his open mouth to the jury for inspection, but defendant chose not to do so.[1] It is difficult, therefore, to demonstrate how defendant was prejudiced by the loss of the photographs, given the remarkable ease with which he could have provided comparable evidence of his innocence, simply by showing his teeth at trial. Granted, if the condition of defendant's teeth had changed in the interim between arrest and trial, then his teeth would not have constituted comparable evidence. But in that case, defendant could have shown his teeth to the court and presented proof of when, if any, post-arrest damage or alteration to his teeth had occurred.

Indeed, it could be argued that the absence of the photos might have turned "the uncertainty as to what the evidence might have proved *** to the defendant's advantage." *Youngblood,* 488 U.S. at 60, 109 S.Ct. at 338, 102 L.Ed.2d at 290 (Stevens, J., concurring). Apparently, the trial justice here surmised as much in referring to defense counsel's frustration that the photos were not available:

1. The defendant here was not compelled to exhibit his personal characteristics. Even if he were, however, the privilege against compulsory self-incrimination is not implicated by the exhibition of one's person or other characteristics not involving testimonial utterances. *Holt v. United States,* 218 U.S. 245, 252–53, 31 S.Ct. 2, 6, 54 L.Ed. 1021, 1030 (1910). The privilege against self-incrimination applies solely to evidence of a "testimonial or communicative nature," *Schmerber v. California,* 384 U.S. 757, 761, 86 S.Ct. 1826, 1830, 16 L.Ed.2d 908, 914 (1966), and not usually to "fingerprinting, photographing, or measurements *** [or a request] to stand, to assume a stance, to walk, or to make a particular gesture." *Id.* at 764, 86 S.Ct. at 1832, 16 L.Ed.2d at 916.

"I'm sure that if the photos were available [the prosecutor] would love to have them himself, because apparently they would confirm what Detective Springer testified to, as I recall, during the suppression hearing, as well as during the trial. *** I would think the last thing [defendant] would want to have is that photograph in this courtroom."

Thus, defendant failed to meet the test set forth in *Youngblood* and *Trombetta,* which was adopted by this Court in *Garcia.* We therefore deny his appeal on this issue.

**In-Court Identification**

The defendant contended on appeal that the trial justice should have barred Newman from making an in-court identification of defendant on the ground that he lacked sufficient personal knowledge to identify his assailant and thus was incompetent to do so under Rule 602 of the Rhode Island Rules of Evidence.[2] The defendant also attacked the in-court identification procedure as "highly suggestive." The defendant, however, failed to raise either objection at trial at the time that Newman made the positive identification of defendant.

"It is well settled that this court will not review issues that were not preserved for appeal by a specific objection at trial." *State v. Pineda,* 712 A.2d 858, 861 (R.I.1998) (citing *State v. Snow,* 670 A.2d 239 (R.I.1996)). The defendant moved pretrial to suppress both the in-court and out-of-court identifications, but the trial justice denied his motion. The defense attorney offered no objection to the court after this denial, nor did he object at trial when the identifications were presented as testimony. To preserve an issue for appeal to this Court, the appealing party generally must have made a "contemporaneous objection, as mandated by Super.R.Crim .P. 51."[3]

Although grounds for the admission of evidence not raised before the trial justice will not normally be considered on review by this Court, *State v. Gomes,* 690 A.2d 310, 319 (R.I.1997), we have recognized an exception to this raise-or-waive rule if "basic constitutional rights are concerned." *State v. Mastracchio,* 672 A.2d 438, 446 (R.I.1996). Not only must the alleged error be more than harmless, in addition, the exception must implicate an issue of constitutional dimension derived from a novel rule of law that could not reasonably have been known to counsel at the time of trial. *Gomes,* 690 A.2d at 319. In our opinion, counsel's failure to object here was not due to a constitutional issue reasonably unknown to counsel during the course of trial. In reaching this conclusion, we examine whether allowing Newman's identification raised novel constitutional questions either as a violation of Rule 602 or as an identification that was unduly suggestive.

The record in this case fails to support defendant's Rule 602 argument. In *State v. Ranieri,* 586 A.2d 1094 (R.I.1991), a case relied upon by defendant, this Court, in establishing the standard for finding evidence inadmissible under Rule 602, held that the trial court must find that the witness actually could not have observed the subject of his or her testimony. *Ranieri,* 586 A.2d at 1098. We held that a witness in *Ranieri* who had been attacked from behind at night in an unlit house, and who for eighteen months had denied having any memory of her attacker's identity, should have been found incompetent to testify on the identity of her attacker. *Id.* at 1099. Just before trial, the witness offered to identify the assailant at trial, but it was shown that the witness evidenced signs

2. Rule 602 of the Rhode Island Rules of Evidence provides, in relevant part, "Lack of Personal Knowledge.—A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."

3. Rule 51 of the Superior Court Rules of Criminal Procedure provides in pertinent part,

"Exceptions unnecessary.—Formal exceptions to rulings or orders of the court are unnecessary; *but* for all purposes for which an exception has heretofore been necessary *it is sufficient that a party, at the time the ruling or order of the court is made* or sought, *makes known to the court* the action which the party desires the court to take or *his or her objection to the action of the court* and his or her grounds therefor if requested ***." (Emphases added.)

of being delusional. Moreover, the Providence Journal–Bulletin newspaper had published the defendant's photograph several times in the course of reporting on the crime. *Id.* at 1098–99. Consequently, we held that the witness lacked the personal knowledge required by Rule 602. *Ranieri,* 586 A.2d at 1099.

In the case at bar, clearly, Newman's personal knowledge of the assailant was vastly superior to that of the witness in *Ranieri.* Newman saw his assailant approach the vehicle and proceeded to drive with him for some time prior to the attack. He conversed with him about directions and sat in the car with him while Cabral and David smoked crack. Therefore, unlike the witness in *Ranieri,* Newman had ample opportunity to observe the individual. If it was unclear or uncertain how much opportunity a witness actually had to view an assailant, the issue would become one of credibility, an issue properly for the jury. "The judge should admit testimony if the jury could find that the witness perceived the event to which he or she is testifying, since credibility is a matter for the jury." 3 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence,* § 602.03[2][a] (Joseph M. McLaughlin, ed., Matthew Bender 2d ed.1997).

The facts in other cases cited by defendant also fail to resemble the facts of the instant case. For example, in *State v. Rice,* 633 A.2d 253 (R.I.1993), a bartender was not allowed to testify about what had occurred in the bathroom of the bar because he himself had not been there to observe it. Newman, in contrast, was present at the scene of the attack and was present as well for some time prior to the attack. Because there was no evidence that Newman lacked sufficient personal knowledge to identify defendant, such that defendant's due process rights were violated, we are of the opinion that defendant waived his right to appeal the alleged Rule 602 violation by failing to object properly at trial.

The defendant's additional argument, that the in-court identification was un*duly* suggestive in violation of his due process rights, was similarly without basis in the record. We review an allegation that procedures surrounding an identification were unduly suggestive by determining whether "the totality of the circumstances discloses procedures that were 'so unnecessarily suggestive and conducive to irreparable mistaken identification that it constituted a denial of due process of law.'" *State v. Andrade,* 657 A.2d 538, 541 (R.I.1995) (quoting *Manson v. Brathwaite,* 432 U.S. 98, 104, 97 S.Ct. 2243, 2248, 53 L.Ed.2d 140, 147 (1977)). Even if a court were to find that the procedures were unduly suggestive, admission of tainted identification testimony does not violate a defendant's due process rights, so long as the identification "possesses sufficient aspects of reliability." *Manson,* 432 U.S. at 106, 97 S.Ct. at 2249, 53 L.Ed.2d at 149. Reliability, then, is "the linchpin in determining the admissibility of identification testimony." *Id.* at 114, 97 S.Ct. at 2253, 53 L.Ed.2d at 154. This Court determines reliability by measuring such factors as: the witness's opportunity to view the accused; the witness's degree of attention; the accuracy of a witness's prior description of the accused; the witness's degree of certainty at the time of the confrontation; and the amount of time that elapsed between the crime and the confrontation. *State v. Camirand,* 572 A.2d 290, 294 (R.I. 1990).

Although it may be true, as defendant alleged, that he was the only African–American male in the courtroom at the time of the in-court identification, Newman previously had identified defendant's photograph in a photo display of African–American males. The out-of-court identification of defendant was thoughtful and cautious. When first presented with a photo array that did not include defendant's picture, Newman indicated that his assailant was not included in the group, but he selected a photograph and said that the man in the photo resembled his assailant very closely. The photograph of this man did indeed bear a striking resemblance to photographs of defendant. When Newman later was presented with a similar photo array that included defendant's photograph, he quickly selected the photograph of defendant, stating that although he was 90 percent positive of the identification, he would rather have the chance to observe the

suspect in a live lineup. Newman made every effort to be conservative and to exercise caution before accusing defendant of the violent attack. As noted *ante,* Newman had considerable time to observe his assailant while driving and sitting in a vehicle with him for some time before the assault. Newman claimed that he was able to obtain a "good look" at his assailant, even to the extent of describing to the police the condition of his attacker's teeth. Although almost a year elapsed between the incident and the confrontation, Newman displayed complete confidence in his ability to identify defendant at trial. The facts here, then, support a conclusion that Newman's history of identification of defendant, even before he made the in-court identification, was reasonably reliable. Hence, we cannot conclude that Newman's in-court identification was made on the basis of defendant's race.

In our opinion, the in-court identification procedure was not suggestive and thus did not constitute a denial of defendant's due process rights. Absent " 'a very substantial likelihood of irreparable misidentification.' * * * [S]uch evidence is for the jury to weigh." *Manson,* 432 U.S. at 116, 97 S.Ct. at 2254, 53 L.Ed.2d at 155. In evaluating the totality of the circumstances, it is our opinion that Newman's identification of defendant possessed sufficient indicia of reliability to preclude any substantial likelihood of misidentification. Juries are capable and indeed are responsible for "measur[ing] intelligently the weight of identification testimony that has some questionable feature." *Id.* We conclude that because the in-court identification here was not suggestive, it did not implicate defendant's due process rights, nor was it of substantial constitutional dimensions. Therefore, the issue was waived, and this Court cannot properly consider it.

### Conclusion

In summary, for the foregoing reasons, we deny and dismiss the defendant's appeal and affirm the judgment of the Superior Court, to which the record in this case may be returned.