July 18, 2025

**Supreme Court**

No. 2023-23-C.A.
(P1/17-2522A)

State          :

v.           :

Larry Threadgill.      :

NOTICE:   This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email:   opinionanalyst@courts.ri.gov,   of   any typographical  or  other  formal  errors  in  order  that corrections may be made before the opinion is published.

State                              :

v.                                :

Larry Threadgill.                 :

Present:  Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ.

## O P I N I O N

**Justice Goldberg, for the Court.**    The defendant, Larry Threadgill (defendant or Threadgill), is before the Court on appeal from a judgment of conviction for first-degree sexual assault following a jury trial in the Superior Court. The defendant argues that the trial justice's refusal to instruct the jury on the defense of consent was erroneous; that the trial justice erred when he refused to give a spoliation instruction; and that the trial justice erred when he gave an *Allen* charge to the jury, rather than declaring a mistrial.  For the reasons set forth herein, we affirm the judgment of the Superior Court.

### Facts and Travel

On a summer day in 1999, Stacey Jeffery (Jeffery or complaining witness) first met defendant at the Pawtucket branch of the Division of Motor Vehicles

- 1 -

(DMV). While engaging in small talk and commiserating over the long wait times, defendant and Jeffery decided to go out for ice cream after their DMV appointments. They exchanged telephone numbers and over the next several days, Jeffery and defendant frequently spent time together. Jeffery testified at trial that, soon after their ice cream trip, defendant introduced her, as his friend, to his mother. Jeffery further testified that defendant's mother seemed like a "nice woman," who gave Jeffery an air-conditioning unit for her apartment. At the point when Jeffery met defendant's mother, she testified that her relationship with defendant, was "[j]ust basic. Just friends. Nothing out of being platonic"; she and defendant had never kissed, never held hands, and never had sex together; "[i]t was a platonic relationship."

Having only known defendant for less than two weeks, Jeffery next testified to the following events that occurred on July 8, 1999. That afternoon, Jeffery had gone out with her friends. Upon returning home, she recalled that it was still daylight when, by happenstance, she turned around in her kitchen toward the back door and saw defendant standing outside. The defendant's unannounced visit frightened Jeffery because "[she] hadn't expected him to come over"; and was fearful because of his unexpected arrival. Nonetheless, Jeffery invited defendant inside, thinking she "had nothing to fear"; and that it was just his unannounced appearance that startled her.

The two spent approximately twenty minutes in the living room engaging in light conversation before Jeffery excused herself momentarily to grab a cigarette from her bedroom. She testified that she "walked over to [her] dresser and got [her] cigarettes, and when [she] turned around, [defendant] was standing in [her] bedroom threshold." Jeffery told defendant "[l]et's go back to the living room. I can't entertain you in my bedroom." Jeffery testified that she told defendant she could not entertain him in her bedroom because they "[were] not boyfriend and girlfriend. [We were] not seeing each other. None of that. Just strictly platonic friends." The defendant did not comply; instead, "[h]e came over the threshold and grabbed [Jeffery's] shirt." As Jeffery repeatedly told defendant "No"; "Don't do that"; "Do not touch me," defendant proceeded to forcefully grab her.

Jeffery recounted that defendant then

> "grabbed me by my pants, started to pull on them, broke the zipper off of my pants, pushed me down on my bed. I crossed my ankles, and he put his knee between my legs. Had my hands over my head like such with one of his hands. And then he started pulling down my jeans."

The defendant pulled Jeffery's jeans off, and pushed her down onto the bed, where Jeffery lay exposed. "[T]rying to hold up my pants and holding my shirt so my breasts wouldn't be exposed," and "constantly telling [defendant], [']No. Stop. What are you doing? No. Stop,[']" Jeffery resisted, but unfortunately, her efforts were not enough to overcome defendant; she testified that:

> "I had my legs crossed at my ankles so he wouldn't be able to separate my two legs, but he did, because he put his penis inside me, raped me. And, then, when he was finished, I got up, I went into the bathroom to take a shower. He was outside of my bathroom door trying to get in."

Jeffery repeatedly told defendant "You need to leave. You need to leave," but when she finished her shower, defendant was still standing in her kitchen where she said, yet again, "You have to leave. You have to leave now."

After the assault, Jeffery called her friend, Lynette Lyndsey, a cousin, and defendant's mother. Jeffery testified that she felt sick to her stomach, her nerves were shot, and she was shaking. Following the July 8, 1999 incident, Jeffery suffered significant mental and emotional distress for years to come. Within weeks of the incident, she began experiencing symptoms of schizophrenia. That summer, Jeffery suffered three mental breakdowns, and was diagnosed with schizophrenia and clinical depression.[1]

Jeffery testified that she sought medical care for these episodes and was hospitalized for approximately one week at Butler Hospital, fourteen days at Newport Hospital, and, after she left Rhode Island, Jeffery spent approximately seven to eight days in a hospital located in Missouri. She also testified that her "emotions were scattered," and, because she could not mentally comprehend what

---

[1] These episodes caused Jeffery to suffer from hearing voices and seeing things on television which were not displayed.

happened on July 8, 1999, she decided to move out of Rhode Island for a period of time.

At trial, Jeffery affirmed that she remains on medication that allows her to distinguish between delusions and reality, and since the July 8, 1999 incident, she has also been diagnosed with depression and post-traumatic stress syndrome. On September 1, 2017, a Providence County grand jury indicted Threadgill, charging him with one count of first-degree sexual assault upon Jeffery, in violation of G.L. 1956 §§ 11-37-2 and 11-37-3 for the events that occurred on or about July 8, 1999.

A jury trial was held in Superior Court in May 2022. At trial, nearly twenty-three years after the incident, Jeffery expressed confidence that she could accurately recall the events of July 8, 1999, and testified that because of her experience, she did not believe she would ever "get better"; "[I] may get an understanding of the situation and try to cope with that, but that's something I'll never forget. Something I'll probably never get over."

In addition to the complaining witness, several other individuals testified. First, the state's witness, Joshua Hardison, M.D., an obstetrician and gynecological physician, testified to the care and treatment that he provided to Jeffery—who "presented to the Women & Infants Triage Unit with reporting of sexual assault * * *." Next, Megan Shaffer, Ph.D., an employee at LabCorp, a genetic and clinical testing lab, testified as an expert witness regarding the characteristics of DNA, and

the analysis that was conducted with the sample that was collected from Jeffery in July 1999. Dr. Shaffer concluded that "[t]hese profiles appear[ed] to be very nice single source, complete profile. Single source meaning from a single individual."

The next witness was Cara Lupino, the Supervisor and DNA Technical Leader of the Forensic Biology and DNA Laboratory from the Rhode Island Department of Health. Lupino explained that a "[r]eference sample is a known sample taken from an individual. It can be either a blood sample or a buccal swab * * * and those are considered reference samples or known samples." Lupino distinguished the reference samples from an evidence sample, stating that "[e]vidence samples are samples taken from a crime scene, and those are considered question samples or evidentiary samples." Thus, Lupino testified that, by analyzing and comparing these two samples, the reference sample and the evidentiary sample, "[t]he end goal of the actual testing is to produce a DNA profile that can be used to compare between known samples and unknown samples."

At trial, Lupino's uncontradicted testimony concluded "to a reasonable degree of scientific certainty" that "the DNA profile previously obtained" from the complaining witness's sexual assault kit, was "consistent with the known-reference profile from Larry Threadgill." According to the statistical analysis, defendant's reference or known DNA sample matched the evidentiary sample at approximately 1 in 400 quintillion—"400 with 18 zeros." In other words, Lupino explained that

"[i]n theory this means that [she] would have to test 400 quintillion people to find [defendant's] DNA profile again in a random population."

Providence Police Detective Ralph Costantino of the Bureau of Criminal Identification also testified at trial. Detective Costantino testified that on May 3, 2017, he assisted in obtaining a buccal swab from defendant. During his testimony, there was no discussion about any other evidence, including a pair of jeans that were collected in 1999. Finally, the complaining witness's friend, Lynette Lindsey, testified that Jeffery called her soon after the incident and told Lindsey that "[h]e raped me"; and that she could hear the devastation in her voice.

After one and one-half days of deliberations, the jury returned a guilty verdict, and the trial justice denied defendant's motion for a new trial. Thereafter, defendant was sentenced to thirty-five years at the Adult Correctional Institutions, with twelve years to serve and twenty-three years suspended, with thirty-five years' probation. The defendant filed a timely notice of appeal.

## Issues on Appeal

The defendant raises three issues on appeal: (1) that the trial justice erred by refusing to instruct the jury on the defense of consent; (2) that the trial justice failed to instruct the jury on a missing evidence instruction; and (3) that the trial justice should have declared a mistrial rather than giving the jury an *Allen* charge. We address each of these arguments in turn.

**Standard of Review**

"This Court reviews jury instructions on a *de novo* basis." *State v. Esdel*, 317 A.3d 756, 765 (R.I. 2024) (quoting *State v. Isom*, 251 A.3d 1, 6 (R.I. 2021)). "It is well settled that this Court 'reviews jury instructions in their entirety,' and 'we will affirm if the instructions adequately cover the law and neither reduce nor shift the state's burden of proof.'" *State v. Martin*, 68 A.3d 467, 473 (R.I. 2013) (brackets omitted) (quoting *State v. Lopez*, 45 A.3d 1, 22 (R.I. 2012)). "[W]e review jury instructions 'to ascertain the manner in which a jury of ordinary intelligent lay people would have understood them, and we review challenged portions of jury instructions in the context in which they were rendered.'" *Id.* (deletion omitted) (quoting *State v. Adefusika*, 989 A.2d 467, 475 (R.I. 2010)). This Court has also made clear that "[a]s long as the trial justice's general charge has fairly covered a requested charge for jury instructions, his refusal to grant the requested charge is not reversible error." *Id.* (quoting *State v. Linde*, 876 A.2d 1115, 1128-29 (R.I. 2005)).

**Refusal to Instruct on Consent**

Pursuant to § 11-37-2(2), "[a] person is guilty of first degree sexual assault if he or she engages in sexual penetration with another person" and "[t]he accused uses force or coercion." Section 11-37-1(2)(ii) identifies "[f]orce or coercion" in four instances, including when the accused "[o]vercomes the victim through the

application of physical force or physical violence." This Court has held that "it is the state's burden to prove lack of consent beyond a reasonable doubt." *Martin*, 68 A.3d at 473 (brackets omitted) (quoting *State v. Lynch*, 19 A.3d 51, 60 (R.I. 2011)). "[W]e have also indicated that lack of consent is not an element of the offense, but rather consent is a defense to the crime * * *." *Id.* However, "when a jury charge adequately covers the 'force or coercion' element, *a separate instruction on consent is unnecessary*." *Id.* (emphasis added). For the reasons stated below, we conclude that the trial justice's instruction on force and coercion was adequate; and, thus, the trial justice's refusal to instruct the jury on consent was appropriate.

The trial justice, in relevant part, instructed the jury as follows:

> "The sole charge in the indictment charges that Larry Threadgill did engage in sexual penetration, to wit, penile/vaginal penetration by force or coercion with Stacey Jeffery on or about July 8, 1999 in the City of Providence.
>
> "In order to convict the defendant, the [s]tate must prove each of the following elements beyond a reasonable doubt:
>
> "1. That the defendant engaged in sexual penetration, to wit, penile/vaginal penetration with Stacey Jeffery.
>
> "2. That the defendant did so for the purpose of sexual gratification or sexual arousal.
>
> "3. That the defendant used force or coercion.
>
> "* * *

"To establish the third element of this offense, the [s]tate must show that the sexual penetration was accomplished by force or coercion, against the will of Stacey Jeffery.

"Force or coercion in the context of the charge of sexual assault means *overcoming the victim of a sexual assault through the application of physical force or physical violence*. Force and coercion also includes compelling the victim to submit by threatening to use force or violence, if the victim reasonably believed that the defendant had the present ability to carry out such threats. The threats can occur at any time; it is not necessary that they occur contemporaneously with the sexual act. Furthermore, the threats may be either express or implied and the [s]tate need not prove that the defendant actually spoke threatening words to the victim." (Emphasis added.)

It is clear that the trial justice comprehensively identified what constitutes force and coercion in accordance with §§ 11-37-1 and 11-37-2. For example, under § 11-37-1(2)(ii), the trial justice identified in his instructions that "[f]orce or coercion in the context of the charge of sexual assault means *overcoming the victim of a sexual assault through the application of physical force or physical violence*." *See* § 11-37-1(2)(ii). Additionally, the jury was instructed that, as to Jeffery's resistance, it was not necessary for the state to prove Jeffery physically resisted defendant's "advances if she reasonably believed that such resistance might have resulted in serious bodily injury and would have been useless. * * * All that is required is that Stacey Jeffery offered such resistance, if any, as seemed reasonable under the circumstances."

- 10 -

The defendant requested that the trial justice include an instruction on the defense of consent. Defense counsel requested the following instruction at trial:

> "Evidence has been put before you that the victim in this matter may have consented to the defendant's actions. If the victim voluntarily * * * consented to the act or actions at issue here. Mainly, penile-vaginal penetration. The consent may be expressed in words of a victim's actions or inactions may be -- may imply consent. When there is some evidence of consent, the [s]tate must prove to you beyond a reasonable doubt that the victim did not consent to the acts in question or that the consent was not voluntary. If the [s]tate fails to prove that to you beyond a reasonable doubt, you must find the defendant not guilty."

The trial justice denied defendant's request; and, on appeal, defendant argues that there "was at least a scintilla of evidence of consent," and that "whether the [t]rial [j]ustice was himself persuaded by it was irrelevant." The state refutes the defense's suggestion that the trial justice based his decision upon the failure of defendant to testify; but, as the state argued and the trial justice concluded, there was no evidence of consent to sexual intercourse. Although the trial justice permissibly instructed the jury that they "may consider * * * the nature of the relationship between the parties," the complaining witness's testimony was uncontradicted. Specifically, Jeffery testified that she and defendant were "[j]ust friends. Nothing out of being platonic"; and that they had never kissed, never held hands, and never had sex together; "[i]t was a platonic relationship." The defendant has not directed us to any evidence to the contrary. While it was defendant's

- 11 -

constitutional right not to testify, the trial justice could only consider Jeffery's testimony, which was uncontradicted. The trial justice concluded that there was not "a scintilla of evidence that there was consent in this case * * *." We agree.

We have made clear that "[a]s long as the trial justice's general charge has fairly covered a requested charge for jury instructions, his refusal to grant the requested charge is not reversible error." *Martin*, 68 A.3d at 473 (quoting *Linde*, 876 A.2d at 1128-29). After reviewing the trial justice's jury instructions *de novo*, we reviewed the "challenged portions of jury instructions in the context in which they were rendered," and conclude that the trial justice's instruction on force and coercion was adequate. *Id.* (quoting *Adefusika*, 989 A.2d at 475). Thus, the trial justice's refusal to instruct the jury on consent was not erroneous.

In seeking an instruction on consent, defendant alleged that he and Jeffery had formed a romantic relationship, and that this single factor—contrary to the complaining witness's testimony and other evidence presented at trial including her physical injuries—gave rise to an inference of consent. However, there is no evidence in the record before us that suggests defendant and Jeffery were romantically involved. The testimony is clear; they were acquainted for less than two weeks before the assault.[2] After Jeffery initially met defendant at the DMV,

---

[2] At sentencing, it was revealed that defendant had been released from the Adult Correctional Institutions in an unrelated case shortly before he met Jeffery at the Pawtucket branch of the DMV in 1999.

- 12 -

they went out for ice cream, and over the next several days, they continued to spend time together. At trial, Jeffery testified that defendant introduced her to his mother as a friend, and there were no expectations about the relationship at that time because they were "[j]ust friends. * * * It was a platonic relationship."

The defendant argues that these interactions rise to the level of a romantic relationship. The record before us is devoid of any suggestion of romance whatsoever. Assuming *arguendo* on the basis of these scant facts that defendant and Jeffery did form a romantic relationship, however slight or serious, that relationship without more does not give rise to an inference of consent.

After our comprehensive review of the record, we conclude that the request to instruct on the defense of consent was properly denied.

## Spoliation

The complaining witness testified that she was wearing a pair of jeans when defendant grabbed her and broke the zipper. The record reflects that the jeans were collected for evidence soon after the incident was reported in 1999. At trial, Jeffery recounted that "[she] told the detectives that those were the jeans that [defendant] ripped off of me." Approximately twenty-three years later, the state did not produce the physical evidence at trial.[3]

---

[3] At trial, Jeffery was asked to identify a photograph that depicted the jeans she wore on July 8, 1999, and that were collected in a bag by the police.

We begin by noting that defense counsel has mischaracterized the argument, contending that the trial justice erred "when he refused to give a missing evidence instruction that * * * directly impacted the only question the jury was charged with answering"—whether the state met its burden to prove defendant had committed sexual assault in the first degree by "force or coercion."[4] It is clear from the record that defendant has raised a spoliation-of-evidence argument on appeal and, thus, further contends that the trial justice's refusal to so instruct the jury was error. We limit our analysis to defendant's argument under the doctrine of spoliation, the only issue that was raised.

"Under the doctrine *omnia praesumuntur contra spoliatorem*, 'all things are presumed against a despoiler or wrongdoer,' * * * the deliberate or negligent destruction of relevant evidence by a party to litigation may give rise to an inference that the destroyed evidence was unfavorable to that party." *Tancrelle v. Friendly Ice Cream Corporation*, 756 A.2d 744, 748 (R.I. 2000) (brackets omitted) (quoting Black's Law Dictionary 1086 (6th ed. 1990)). This Court has recognized that "the doctrine of spoliation *merely permits* an inference that the destroyed evidence would

---

[4] On appeal, the state notes that during a motion *in limine* filed below, defendant "explicitly requested only a 'spoliation' instruction based upon and apparently taken verbatim from a Rhode Island civil negligence case." Whereas here, as this Court noted above, defendant on appeal contends that the trial justice erred in refusing to give a "missing evidence instruction."

- 14 -

have been unfavorable to the despoiler, but does not make that inference conclusive." *State v. Barnes*, 777 A.2d 140, 145 (R.I. 2001) (emphasis added) (internal quotation marks omitted). However, "[i]f spoliation is established, 'the fact finder *may* then draw the inference that the evidence destroyed was unfavorable to the party responsible for its spoliation.'" *Id.* (emphasis added) (brackets omitted) (quoting *State v. Langlet*, 283 N.W.2d 330, 333 (Iowa 1979)). This Court has also observed that "[s]uch a presumption or inference ordinarily would arise where the act was intentional or intended to suppress the truth, but 'does not arise where the destruction was a matter of routine with no fraudulent intent.'" *Id.* (quoting 29 Am. Jur. 2d *Evidence* § 244 at 256). There is no suggestion in the record before us that the loss of the jeans was intentional or intended to suppress the truth.

Significantly, when the state has suppressed evidence that materially affects questions of guilt or punishment, a defendant's due-process right to a fair trial has been violated. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963); *see also State v. Vanover*, 721 A.2d 430, 433 (R.I. 1998). In *Vanover*, this Court observed that cases in which a defendant has "alleged a due process violation resulting from allegedly exculpatory evidence, this Court employs the standard set forth by the United States Supreme Court for dismissal of an indictment on the basis of lost or destroyed evidence." *Vanover*, 721 A.2d at 433. "[T]o prove a violation of due process in circumstances in which potentially exculpatory evidence has been lost, a defendant

- 15 -

must show that: (1) the evidence possessed an exculpatory value that was apparent before the evidence was destroyed; * * * (2) the defendant would be unable to obtain comparable evidence by other reasonably available means; * * * and (3) there was bad faith on the part of the state." *Id.* (internal quotation marks omitted) (quoting *California v. Trombetta*, 467 U.S. 479, 489 (1984)).

In *Vanover*, this Court addressed the issue of "inadvertent suppression of evidence" originally presented to us in *State v. Garcia*, 643 A.2d 180 (R.I. 1994), and noted that "when evidence is missing or destroyed, *unless* a criminal defendant can show bad faith on the part of the state, failure to preserve *potentially useful evidence does not constitute a denial of due process of law*." *Vanover*, 721 A.2d at 433 (emphasis added) (brackets omitted) (quoting *Garcia*, 643 A.2d at 185); *see Arizona v. Youngblood*, 488 U.S. 51, 58 (1988). However, "unless a defendant is able to meet the *Youngblood-Trombetta* standard," thus, asserting a viable due-process violation, this Court will "neither dismiss the indictment nor otherwise penalize the prosecution." *Vanover*, 721 A.2d at 433.

We note the distinction between civil and criminal cases regarding the doctrine of spoliation. This Court observed in *Tancrelle*, a civil case involving a premises liability action, that "although a showing of bad faith may strengthen the inference of spoliation, *such a showing is not essential*." *Tancrelle*, 756 A.2d at 748 (emphasis added). Whereas in *Garcia* and *Vanover*—both criminal cases—we

- 16 -

observed that "when evidence is missing or destroyed, '*unless a criminal defendant can show bad faith on the part of the state*, failure to preserve potentially useful evidence does not constitute a denial of due process of law.'" *Garcia*, 643 A.2d at 185 (emphasis added) (brackets omitted) (quoting *Youngblood*, 488 U.S. at 58); *see also Vanover*, 721 A.2d at 433. "[T]he prominence afforded the bad-faith requirement is rooted in part in the Supreme Court's 'unwillingness to read the fundamental fairness requirement of the Due Process Clause as imposing on the police an undifferentiated and absolute duty to retain and to preserve all material that *might* be of conceivable evidentiary significance in a particular prosecution.'" *Garcia*, 643 A.2d at 185 (emphasis added) (deletion omitted) (quoting *Youngblood*, 488 U.S. at 58).

In this case, although the trial justice initially granted defendant's pretrial motion that requested a spoliation jury instruction, he stated that "[t]he actual wording of the instruction [was] going to depend on the evidence produced by the [s]tate and on cross-examination." Notably, Jeffery was the only witness at trial who testified about the jeans with the broken zipper. The record is devoid of any further testimony concerning the chain of custody of the jeans after the jeans were provided to the Providence police detectives. The trial justice cautioned defense counsel that, in order to instruct the jury on spoliation, the jury would be informed that "before they [could] draw an adverse inference" in this case, "they [would] have to find that

the despoiler, in this case, the [s]tate, either deliberately or negligently caused the alleged missing evidence to be unavailable and only then could they find or draw an adverse inference that * * * the missing evidence could have been unfavorable to the despoiler." This showing was not met.

The court later revisited defense counsel's request for an instruction on spoliation, and analyzed, under our caselaw, whether there was a due-process violation stemming from the allegedly exculpatory evidence. *See Vanover*, 721 A.2d at 433. The trial justice noted that defendant must establish "that the evidence possessed an exculpatory value that was apparent before the evidence was destroyed"; that "defendant would be unable to obtain comparable evidence by other reasonably available means"; and that "there was bad faith on the part of the [s]tate * * *."

In the case before us, defendant suggests that mere possession of the missing item, without more gives rise to an inference that the evidence would have been "unfavorable" to the state's position. We disagree. At trial, the state appropriately objected to defense counsel's spoliation instruction, arguing that according to *Vanover* and *Garcia*, the burden is on defendant to prove that "the evidence possessed exculpatory value that is apparent for evidence that was destroyed"; and that there was "bad faith on the part of the [s]tate" and, therefore, a spoliation instruction was unwarranted. *See Vanover*, 721 A.2d at 433; *see also Garcia*, 643

A.2d at 185.  On appeal, the state asserts that defendant failed to raise and establish in the Superior Court "a due process violation for the suppression of exculpatory evidence" and, therefore, the trial justice appropriately denied defendant's request for the spoliation instruction and the instructions as a whole "did not reduce or shift the state's burden of proof."  We agree.

As the trial justice observed, there is no evidence in the record before us to suggest that the jeans were exculpatory in value, that defendant could not obtain comparable evidence by other reasonable means, or that the state acted in bad faith, gross negligence, or with an intent to suppress such evidence. *See Vanover*, 721 A.2d at 433.  The record is further devoid of any evidence to suggest that the jeans were intentionally destroyed or negligently lost to the extent that it would constitute gross negligence.

The defendant, however, asserts that if the jeans were produced, and contrary to Jeffery's testimony, the zipper *was* intact, this fact could have served to impeach the complaining witness's testimony—that defendant grabbed her jeans and broke the zipper, and thus call into question the complaining witness's credibility.  This is rank speculation and speaks to impeachment.

### The Trial Justice's *Allen* Charge

On appeal, defendant contends that, after the jury notified the court that the jurors had reached an impasse, it was error for the trial justice to proceed with an

*Allen* charge.[5]  The note from the jury foreperson indicated that "All the Jurors can not [*sic*] agree on a verdict.  The Jurors agree with the charge with sexual penetration and sexual gratification, but not on force or coercion.  Please let us know what to do next? 11-Guilty[;] 1-Not Guilty."

The defendant asserts that the trial justice's *Allen* charge was "improperly coercive for two reasons." First, "the trial justice gave an *Allen* charge over [defendant's] objection despite knowing that there was one holdout juror and there being multiple indicators that the jury was genuinely deadlocked."  The defendant argues that "[w]hen the eleven-to-one split is viewed in the context of the deadlocked jury, it was inevitable that the supplemental charge would be understood as directed to the solitary juror conscientiously holding fast to their view of the evidence."  The defendant cites to *State v. Luanglath*, 863 A.2d 631 (R.I. 2005), where this Court held that a trial justice's *Allen* charge impermissibly exceeded the boundaries set in *State v. Patriarca*, 112 R.I. 14, 308 A.2d 300 (1973). *See Luanglath*, 863 A.2d at 644.  The defendant's reliance on *Luanglath* is misguided.  We view our holding in *State v. Rodriguez*, 822 A.2d 894 (R.I. 2003), as more akin to the facts and circumstances presented in this case.

---

[5] "An *Allen* charge is a supplemental jury instruction given by the court to encourage a deadlocked jury, after prolonged deliberations, to reach a verdict." *State v. Gordon*, 30 A.3d 636, 640 n.9 (R.I. 2011) (brackets omitted) (quoting *State v. Vargas*, 21 A.3d 347, 351 n.8 (R.I. 2011)).

It is well settled that when this Court is tasked with assessing whether a trial justice's *Allen* charge was permissible, we review the supplemental instruction "in its context and under all the circumstances." *Rodriguez*, 822 A.2d at 899-900 (quoting *Jenkins v. United States*, 380 U.S. 445, 446 (1965)); *see also State v. Souza*, 425 A.2d 893, 900 (R.I. 1981) (observing that when a defendant challenges a trial justice's *Allen* charge, the Court must consider the particular facts and circumstances of the case). "Although trial justices need not adhere to a specifically patterned jury instruction when addressing a deadlocked jury, all *Allen* charges should be meticulously fair to both the defendant and to the state. Trial justices 'must not infringe upon the factfinding province of the jury by coercion or improper suggestion' * * *." *Rodriguez*, 822 A.2d at 900-01 (footnote omitted) (quoting *Souza*, 425 A.2d at 900). The *Rodriguez* Court further observed that "[j]ury instructions are not given in a vacuum. They must relate to the circumstances of the case and, *particularly in respect to supplemental charges, may depend upon the length of deliberation and the questions that have been asked by the jurors*." *Id.* (quoting *Souza*, 425 A.2d at 900).

With these principles in mind, we begin our analysis of the particular *Allen* charge in this case. At the close of the evidence presented, after the trial justice charged the jury and counsel presented their arguments, jury deliberations did not

- 21 -

extend for an inordinate length of time. At approximately 12:46 p.m. on the Friday before Memorial Day weekend, the jurors began deliberations.

Later that afternoon, the court received a request from the jury for the medical report of Dr. Joshua Hardison. After conferring with counsel, the trial justice informed the jury that "[o]nly full exhibits are available to the jury during [its] deliberations. There is no medical report of Dr. Hardison which is a full exhibit." Deliberations resumed and the court excused the jury at 3:50 p.m. for the long holiday weekend. Jurors were ordered to recommence deliberations at "9:30 on Tuesday morning."

On Tuesday, May 31, 2022, the jury reconvened to deliberate. That afternoon, the trial justice received a communication from the jury foreperson that the jurors were deadlocked and—unfortunately—how they were divided. Defense counsel moved to pass and requested a mistrial because, he suggested, a response to the note "would be coercive and unduly forcive [*sic*]." Defense counsel argued that, because the court was aware of the breakdown, an instruction would inevitably send a message to the one holdout juror, which would deprive defendant of his right to a fair trial. In response, the state objected to defendant's motion to pass and requested that the trial justice instruct the jury with an *Allen* charge. Accordingly, the trial justice denied defendant's motion to pass and proceeded to instruct the jury as follows:

"Members of the jury, you have transmitted a note to me that indicates that you are having difficulty reaching a unanimous verdict. We do not need to know how you're divided at this time or what issues may be troubling you. I do ask, however, that you continue your deliberations in an effort to reach a unanimous verdict as to the questions before you.

"The principal mode provided by our constitution and our laws for deciding criminal cases is by a jury verdict. You should consider it desirable that the case be decided. There is no reason to believe that this case will ever be submitted to a jury any more capable, impartial, or intelligent than you are. Furthermore, there is no reason to believe that more or clearer evidence will be produced at a second trial. It is your duty to decide this case if you can conscientiously do so.

"To assist you in this regard, you are instructed as follows: In order to return a verdict, each juror must agree to that verdict. Jurors have a duty to consult with one another and to deliberate with a view toward reaching an agreement if it can be done without violence to individual judgment. Each juror must decide the case for himself or herself but only after an impartial consideration of the evidence with his or her fellow jurors.

"In the course of deliberations, a juror should not hesitate to reexamine his or her own views and change his or her opinion if convinced it is erroneous. But no juror should surrender his or her honest conviction as to the weight or effect of the evidence solely because of the opinion of his or her fellow jurors or for the mere purpose of returning a verdict.

"As I told you before, you do not have to surrender your opinion just because others have a different point of view, but bear in mind, as I also told you before, that you should keep your minds reasonably open with respect to any point

- 23 -

in dispute so that you will not be prevented from reaching a unanimous verdict simply because of stubbornness.

"In any event, you should listen to the views expressed by your fellow and sister jurors with a disposition to reach a verdict if, in good conscience, you can do so. If after such careful reconsideration you are still deadlocked, please notify the sheriff in the same manner. Do not indicate in the note if you are divided, what the division is, if that is the case. Please consider these instructions together with the law on which I instructed you previously and the testimony and evidence presented to you during this trial.

"Now, mindful of my instructions, I would ask that you return upstairs to continue your deliberations at this time."

First, we note that the court received a total of three questions from the jury. On Friday, May 27, 2022, the jury sent its first communication to the court requesting Dr. Hardison's medical report. By 3:50 p.m., the jury had not reached a verdict and deliberations ceased for the long weekend. On Tuesday, May 31, 2022, the jurors reconvened, and at approximately 11:04 a.m., the jury sent its second question, in which the jury requested the transcript of Dr. Hardison's testimony. The court responded to the jury's inquiry, and the deliberations resumed. Just before the start of the third hour after the second question, at approximately 1:52 p.m., the court was advised that the jury was deadlocked and how the jury was divided. Two hours after the *Allen* charge, at approximately 3:45 p.m., the jury returned a unanimous verdict of guilty.

For the reasons that follow, we reject defendant's argument that this case is similar to *Luanglath* and conclude that the facts and circumstances regarding this *Allen* charge and the case at bar are on all fours with the *Allen* charge challenge in *Rodriguez. Compare Rodriguez*, 822 A.2d at 901-04, *with Luanglath*, 863 A.2d at 634-35.

In *Rodriguez*, when the jury indicated to the trial justice that it "had reached an impasse and that they were deadlocked eleven to one in favor of finding [the] defendant guilty[,]" this Court observed that disclosure of the numerical division of votes did not render the trial justice's *Allen* charge coercive because the jury foreperson disclosed "the exact numerical split to the court." *Rodriguez*, 822 A.2d at 902. We further observed that the disclosure of the jury's split was "simply one of the facts that must be considered in evaluating the totality of the circumstances" and that the disclosure of the numerical split alone "did not render the supplemental instructions coercive because the trial justice did not request this information." *Id.*

In the case before us, like *Rodriguez*, the note from the jury unfortunately indicated that the jury was deadlocked eleven to one in favor of guilty. The numerical split is a fact that is considered in the totality of the circumstances when evaluating whether the *Allen* charge was coercive, but it is not a fatal factor. Indeed, the trial justice specifically cautioned the jurors during its instructions that "[i]f, during your deliberations, questions should arise requiring further instructions from

me * * * the foreperson will reduce the question or the request in writing and give it to the sheriff, who will give it to me. * * * *If a written communication is sent to me, I caution you that it should not contain any specific reference as to how you are divided*, if that is the case." (Emphasis added.)  During the *Allen* charge, the trial justice, once again, reminded the jury that "[i]f after such careful reconsideration you are still deadlocked, please notify the sheriff in the same manner.  *Do not indicate in the note if you are divided, what the division is*, if that is the case." (Emphasis added.)  We therefore reject defendant's arguments that the trial justice's instruction was coercive.

Next, we reject defendant's contention that the holdout juror knew he or she was "the one the trial justice was addressing when he instructed that 'a juror should not hesitate to reexamine his or her own views and change his or her opinion if convinced it is erroneous' and that the 'jurors have a duty * * * to deliberate with a view toward reaching an agreement.'"

In *Souza*, this Court noted that "[j]ury instructions are not given in a vacuum. They must relate to the circumstances of the case and, *particularly in respect to supplemental charges, may depend upon the length of deliberation and the questions that have been asked by the jurors*." *Souza*, 425 A.2d at 900 (emphasis added).  At most, the deliberations in this case spanned one and one-half days, separated by a three-day weekend.  This is not an overly lengthy period.

Here, defendant takes issue with the trial justice instructing the jurors that they "should not hesitate to reexamine his or her own views and change his or her opinion if convinced it is erroneous." Contrary to *Rodriguez* and *Souza*, defendant appears to view portions of the *Allen* charge in a vacuum. The trial justice also informed the jurors that they "do not have to surrender their opinion just because others have a different point of view, but bear in mind * * * that you should keep your minds reasonably open with respect to any point in dispute so that you will not be prevented from reaching a unanimous verdict simply because of stubbornness." As we identified in *Rodriguez,* an instance where a trial justice "require[s] the jury to reach a verdict or order[s] one juror in the minority to change his or her opinion" would be problematic. *Rodriguez*, 822 A.2d at 903. There is nothing in the record before us that suggests either of those scenarios, and, thus, these excerpts of the *Allen* charge, viewed in the context of the entire instruction, were not coercive.

Second, defendant argues that the *Allen* charge was coercive "when it presented a retrial as an inevitable consequence of a failure to reach a verdict." It appears that the portion of the *Allen* charge defendant maintains was coercive was when the trial justice informed the jurors that:

> "The principal mode provided by our constitution and our laws for deciding criminal cases is by a jury verdict. You should consider it desirable that the case be decided. There is no reason to believe that this case will ever be submitted to a jury any more capable, impartial, or intelligent than you are. Furthermore, there is no reason

- 27 -

to believe that more or clearer evidence will be produced at a second trial. It is your duty to decide this case if you can conscientiously do so."

In *Rodriguez*, we recognized that "the better practice when giving an *Allen* charge would be for the trial justice to indicate that, *in the event of a mistrial, a retrial was a distinct possibility*—instead of suggesting, as in [*State v. Vega*, 789 A.2d 896 (R.I. 2002)], that [a retrial] was inevitable if the jury was unable to reach a verdict in the pending case." *Rodriguez*, 822 A.2d at 904 (emphasis added). Specifically, in *Vega*, the trial justice instructed the jurors, stating "[i]f you people don't reach a verdict this case has to be tried again and it is expensive to the state as expensive to the defendant." *Vega*, 789 A.2d at 898. Although we concluded that the trial justice erred by assuming the case would be retried in the event of a mistrial, this Court ultimately determined that this supplemental instruction in its entirety did not rise to the level of coercion. *Id.* The instruction before us does not equate with the erroneous language in *Vega*. *See id.* The trial justice, here, simply alluded to the fact that no other jury would be more capable, impartial, or intelligent than this jury, nor is there any reason to support the notion that "more or clearer evidence" would be produced. In light of the totality of the circumstances, there is nothing coercive in this instruction. Therefore, we reject defendant's argument that the trial justice's *Allen* charge contained language that suggests a retrial was inevitable.

- 28 -

Considering all the facts and circumstances of this case, we are of the opinion that the trial justice's *Allen* charge was fair, neutral, and not coercive. The *Allen* charge simply encouraged the jurors to continue their deliberations, respectfully and carefully, and consider the differences of opinions among the group in their joint effort to reach a verdict if, "in good conscience," they could do so. *See Rodriguez*, 822 A.2d at 904. Accordingly, viewing the *Allen* charge in its entirety, it did not constitute reversible error.

## Conclusion

For the reasons stated, we affirm the judgment of the Superior Court. The papers in this case are remanded to the Superior Court.



**STATE OF RHODE ISLAND**

**SUPREME COURT – CLERK'S OFFICE**

Licht Judicial Complex
250 Benefit Street
Providence, RI  02903

**OPINION COVER SHEET**

| | |
|---|---|
| **Title of Case** | State v. Larry Threadgill. |
| **Case Number** | No. 2023-23-C.A. (P1/17-2522A) |
| **Date Opinion Filed** | July 18, 2025 |
| **Justices** | Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ. |
| **Written By** | Associate Justice Maureen McKenna Goldberg |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer from Lower Court** | Associate Justice Joseph A. Montalbano |
| **Attorney(s) on Appeal** | For State:<br><br>Virginia M. McGinn<br>Department of Attorney General |
| | For Defendant:<br><br>Michael G. Ewart<br>Office of the Public Defender |